******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

U.S. BANK NATIONAL ASSOCIATION, TRUSTEE
*v.* KARIN C. EICHTEN ET AL.
(AC 39679)

Alvord, Keller and Bright, Js.

*Syllabus*

The plaintiff bank sought to foreclose a mortgage on certain real property
owned by the defendant homeowner, E. The trial court granted the
plaintiff's motion for summary judgment as to liability on the complaint
and on a counterclaim that E had filed. Thereafter, the court rendered
judgment of strict foreclosure, from which E appealed to this court. After
E had defaulted on her mortgage loan, she applied with the plaintiff's
loan servicer, C Co., for a modification of her mortgage loan under
the federal Home Affordable Modification Program (HAMP). Under the
HAMP program and a directive issued by the United States Department
of the Treasury, borrowers who participated in a certain trial period
plan, and who timely made three monthly payments in place of their
normal monthly mortgage payments and met all other program eligibility
requirements, would have their mortgage loans permanently modified.
The Treasury Department directive also required loan servicers to send
borrowers notice if their documentation for a loan modification was
incomplete and a list of additional required documents. C Co. approved
E for entry into the trial period plan and sent her a letter, which stated,
inter alia, that after she timely made all trial period payments and
continued to meet all other program eligibility requirements, C Co. would
send her a modification agreement. The letter further stated that E's
credit score could be affected if she accepted entry into the trial period
plan. Thereafter, C Co. informed E in a letter that her "housing ratio,"
or housing expense as a percentage of her household income, exceeded
the maximum allowed for C Co.'s lending program. C Co. stated that
under applicable HAMP guidelines, E's monthly mortgage payment could
not be less than 31 percent of her household monthly gross income in
order to qualify for a loan modification. C Co. informed E that her
housing ratio at that time was 24.76 percent. C Co. subsequently sent
E two more letters, the first of which stated that she had been denied
a permanent loan modification because her housing ratio exceeded the
maximum allowed for the modification program, and the second of
which explained that her housing expense was not a large enough per-
centage of her household income to qualify for a loan modification. E
objected to the plaintiff's motion for summary judgment and claimed,
inter alia, that she had contacted C Co. to discuss mortgage assistance
options but was told that C Co. would not speak to her unless or until
she stopped making her mortgage payments. E claimed that she relied
on that information and stopped making payments, but that C Co. did
not follow through with its promise to help her with mortgage assistance.
E further claimed that she had timely made the monthly payments under
the trial plan period and remained eligible under the HAMP guidelines
for a loan modification. E also claimed that certain of C Co.'s internal
documents showed that approximately nine months after she had com-
pleted the trial period plan, C Co. approved her application for a loan
modification, but did not inform her of that approval, and did not offer
her a loan modification or send her notice that her documentation was
incomplete. The trial court concluded that no genuine issue of material
fact existed as to any of the special defenses that E had filed. The court
determined, as to the counterclaim, that E and the plaintiff did not enter
into a new contract when she accepted entry into and complied with
the terms of the trial period plan, that the allegations in the counterclaim
did not satisfy the transaction test set forth in the applicable rule of
practice (§ 10-10) and that the counterclaim was barred by the statute
of frauds (§ 52-550 [a]). On appeal to this court, E claimed, inter alia,
that the trial court improperly rendered summary judgment as to liability
on the plaintiff's complaint and on her counterclaim, and improperly
concluded that a genuine issue of material fact did not exist with respect
to her special defenses. *Held*:

1. The trial court improperly rendered summary judgment as to liability on the plaintiff's complaint, as genuine issues of material fact existed as to E's special defense of unclean hands:

a. The trial court improperly concluded that there was no genuine issue of material fact as to whether E could prevail on her special defense of unclean hands, the plaintiff having failed to establish that it adhered to the requirements of the Treasury Department directive; the plaintiff produced no evidence that it made a determination as to E's eligibility for a loan modification at the end of the trial period plan, the plaintiff failed to explain its apparent internal approval of a loan modification for E or to produce evidence as to why it failed to offer her a loan modification, the unexplained length of time it took C Co. to deny E an offer of a permanent loan modification raised a question as to whether C Co. treated her in a fair, equitable and honest manner, and there was no evidence that C Co. sent E notice that her documentation was incomplete and a list of additional required documentation.

b. The trial court improperly concluded that E's special defense of unclean hands was invalid because it did not relate to the making, validity or enforcement of the mortgage note; E's allegations raised a genuine issue of material fact as to whether deceitful or unfair practices on the part of the plaintiff led to its filing of the foreclosure action, the plaintiff's submissions did not defeat the evidence set forth in E's objection that the procedures required by HAMP may not have been followed during the trial period plan process, and the defense of unclean hands does not necessarily need to relate to the making, enforcement or validity of a mortgage loan.

2. E could not prevail on her unpreserved claim that the trial court erred in concluding that her special defense of equitable estoppel failed to raise a genuine issue of material fact as to whether C Co. induced her to default: E's claim on appeal that C Co. knew or should have known that telling her she had to stop payments as a requirement to be considered for a loan modification was misleading differed from her argument to the trial court that C Co. had a practice of instructing mortgagors to stop making payments under the false pretense that doing so would not hurt their credit scores, E never directed the trial court to any authority that supported her claim that C Co. knew or should have known that it was misleading to tell her that she had to stop making mortgage payments to be considered for a loan modification, and E failed to present evidence that she reasonably relied on any promise by C Co. that her credit score would be unaffected or that a loan modification would take place if she defaulted, as the maintenance of a favorable credit score or a loan modification were never certainties at the time she elected to default; moreover, even if E had preserved her equitable estoppel claim, she could not prevail, as she did not claim that C Co. directed her to default or promised her a loan modification if she were to default, the only detriment E alleged was the negative impact on her credit score, and C Co. followed through on its promise to discuss mortgage assistance with her after she defaulted.

3. E could not prevail on her claim that a genuine issue of material fact existed as to her breach of contract special defense, which was based on her assertion that C Co.'s letter in which it offered her entry into the trial period plan created an offer that if she timely made all of the trial period payments, her mortgage would be permanently modified; E failed to allege that she had maintained her eligibility for the HAMP program, which was a condition precedent in the letter, and, thus, her conduct never triggered the plaintiff's duty to perform its obligations under the contract.

4. The trial court did not err in concluding that there was no genuine issue of material fact as to E's special defense of breach of the covenant of good faith and fair dealing in the note and mortgage agreements: C Co.'s failure to offer E a loan modification under the trial period program could not violate the covenant of good faith and fair dealing, as there was no evidence that C Co. impeded E's rights under the note or mortgage agreements, or that it acted in bad faith by misleading her into defaulting, and once E defaulted, C Co. discussed mortgage assistance with her and gave her a trial period plan; moreover, the note and mortgage agreements, and the plaintiff's notices to E that she had defaulted, made clear the consequences of default, the note and mortgage did not require the plaintiff to notify E that her credit rating may be affected if she were to default, neither the note nor the mortgage addressed the situa-

tion where E might need relief from the payment provisions or promised to offer E a loan modification, and there was no evidence that C Co. was motivated to induce E to default for greater fees.

5. The trial court properly concluded that E's special defense of promissory estoppel did not raise a genuine issue of material fact; the plaintiff did not break any promise to E when it declined to modify her loan after she made the three trial period payments, which were not the only contingency under the trial period plan, and E failed to allege that she fulfilled the condition precedent in the trial period plan that required that her housing expense be greater than 31 percent of her household income.

6. The trial court improperly rendered summary judgment in favor of the plaintiff on E's counterclaim sounding in breach of contract:

a. The trial court erred in determining that the counterclaim did not satisfy the transaction test in Practice Book § 10-10, which requires that a counterclaim have a sufficient relationship to the making, validity or enforcement of the note or mortgage; the counterclaim was intertwined sufficiently with the subject of the foreclosure complaint, as the counterclaim alleged the formation and breach of a contractual agreement that was intended to lead to an offer of a permanent modification of E's mortgage loan, E sought relief that was directly connected to the relief sought in the plaintiff's complaint, and the note, mortgage and trial period plan involved the same lender, the same borrower and the same property.

b. On the basis of the record, there was a genuine issue of material fact as to whether a contract was formed and whether there was a breach by the plaintiff; genuine issues of material fact existed as to whether the plaintiff and E formed a contract when E complied with the conditions of the trial period plan and as to whether C Co. was permitted to continue to review E's financial eligibility for the HAMP program after the end of her trial period plan, as the HAMP guidelines suggested an intention not to leave E without notice of a final determination for months after the conclusion of her trial period plan, although a HAMP handbook may have contemplated a trial period plan that lasted more than three months, there was no definite indication in the record that the plaintiff and E ever agreed to a prolonged trial period plan, and it was unquestionable that E suffered some detriment in addition to any preexisting duties that she owed to the plaintiff, as the trial period plan imposed new obligations on her.

c. The trial court improperly determined that the contract that E claimed was created by the trial period plan did not satisfy the statute of frauds, § 52-550 (a), which requires, inter alia, that an agreement for a loan in excess of $50,000 must be in writing; the trial period plan was not an agreement for the sale of real property or any interest in or concerning real property within the meaning of § 52-550 (a), and because the trial period plan, which was supposed to be performed within one year, was not an agreement for a loan in excess of $50,000, it was not a purported contract that fell within the statute frauds, and even if § 52-550 (a) were applicable, the trial period plan was in writing on C Co.'s letterhead and provided proof of the contract.

(*One judge concurring in part and dissenting in part*)

Argued January 25—officially released September 18, 2018

*Procedural History*

Action to foreclose a mortgage on certain of the named defendant's real property, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the named defendant filed a counterclaim; thereafter, the court, *Avallone, J.*, granted the plaintiff's motion for summary judgment as to liability on the complaint and the counterclaim; subsequently, the court rendered judgment of strict foreclosure, from which the named defendant appealed to this court; thereafter, the court, *Avallone, J.*, issued an articulation of its decision. *Reversed; new trial.*

*Loraine Martinez*, with whom were *David F. Lavery* and, on the brief, *Sarah E. White*, for the appellant (named defendant).

*Pierre-Yves Kolakowski*, with whom, on the brief, was *Zachary Grendi*, for the appellee (plaintiff).

*Opinion*

KELLER, J. In this foreclosure action, the defendant Karin C. Eichten[1] appeals from the judgment of strict foreclosure rendered by the trial court in favor of the plaintiff, U.S. Bank National Association, as trustee, successor in interest to Bank of America, National Association as trustee as successor by merger to LaSalle Bank, National Association as trustee for Washington Mutual Mortgage Pass-Through Certificates WMALT 2007-HY2. The defendant claims that, in rendering summary judgment as to liability in the plaintiff's favor with respect to the plaintiff's foreclosure complaint, the court erred in concluding that a genuine issue of material fact did not exist with respect to her special defenses of equitable estoppel, breach of the covenant of good faith and fair dealing, promissory estoppel, unclean hands, and breach of contract, all of which pertain to the conduct of the plaintiff's loan servicer, Chase Home Finance, LLC (Chase), in denying the defendant's application for a loan modification under the federal Home Affordable Modification Program (HAMP).[2] Additionally, the defendant claims that the court improperly rendered summary judgment in the plaintiff's favor on her counterclaim sounding in breach of contract. We reverse the judgment of the trial court.

"In February, 2009, faced with a nationwide foreclosure crisis, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency exercised their authority under the Emergency Economic Stabilization Act, the American Recovery and Reinvestment Act, and the Troubled Asset Relief Program, 12 U.S.C. §§ 5201—5253, and created [HAMP]." *Belyea* v. *Litton Loan Servicing, LLP*, United States District Court, Civil Action No. 10-10931-(DJC), 2011 WL 2884964, *2 (D. Mass. July 15, 2011). HAMP was a national home mortgage modification program aimed at helping at-risk homeowners who were in default or at imminent risk of default by reducing monthly payments to sustainable levels through the restructuring of their mortgages without discharging any of the underlying debt. Id. It was designed to create a uniform loan modification process governed by federal standards that could be used by any loan servicer that chose to participate. Id. "As an incentive for servicers to participate in HAMP, the federal government awards servicers three annual $1,000 payments for each permanent mortgage loan that [was] successfully modified . . . ." Id.

On August 28, 2013, the plaintiff commenced this action against the defendant to foreclose on its mortgage on the defendant's property at 630 Cook Hill Road in Cheshire. The defendant filed a substitute answer and special defenses. The defendant alleged in her special defenses that (1) the plaintiff is equitably estopped from proceeding with the foreclosure action because the plaintiff instructed her to default on her note and mort-

gage obligations, resulting in her credit rating being negatively impacted; (2) the plaintiff breached the covenant of good faith and fair dealing by instructing her to default on her note and mortgage obligations without informing her that a default would result in adverse consequences such as acceleration of the debt; (3) the plaintiff is precluded by promissory estoppel from pursuing a foreclosure action because the plaintiff induced the defendant to default and promised her the offer of a loan modification if she made three trial period payments,[3] and the defendant relied on that promise to her detriment because she never received the promised offer; (4) the plaintiff is guilty of unclean hands because, although she qualified for a loan modification upon completion of her trial period payments, the plaintiff did not offer her a loan modification, but instead, placed her in a forbearance program without her consent; and (5) the plaintiff breached a contract between the parties by failing to offer the defendant a loan modification after she performed her part of the bargain by making the three agreed upon trial period payments.[4]

In her substitute counterclaim, the defendant alleged that the plaintiff breached a contract between the parties when it failed to offer her a loan modification after the defendant performed her obligations under the contract by making her three trial period payments and continued to meet all program eligibility requirements during the trial period. The plaintiff filed an answer to the defendant's counterclaim on September 29, 2015, in which it posited that the alleged contract did not comply with the statute of frauds, and that the counterclaim is legally insufficient and barred by the doctrines of waiver and estoppel. On November 12, 2015, the plaintiff moved for summary judgment as to liability on its complaint, claiming that the defendant's special defenses are insufficient because they are not supported by any evidence and cannot defeat the plaintiff's prima facie showing that it is entitled to foreclose on the subject property. The plaintiff also argued that the defendant's counterclaim is barred by the statute of frauds and has no factual basis.

In support of its motion for summary judgment, the plaintiff provided the court with the affidavit of Michael Piz, a document control officer with the plaintiff's subsequent loan servicer, Select Portfolio Servicing, Inc.,[5] the contents of which are summarized as follows. On December 15, 2006, the defendant executed an adjustable rate note to pay Washington Mutual Bank, FA (Washington Mutual), the principal sum of $480,000, payable with interest, including late charges, costs, and expenses. The indebtedness evidenced by the note was secured by a mortgage, which also is dated December 15, 2006, on the defendant's property at 630 Cook Hill Road in Cheshire. Washington Mutual endorsed the note in blank and on or about September 9, 2009, the Federal Deposit Insurance Corporation, as receiver of

Washington Mutual, executed an assignment of the mortgage to the plaintiff. The assignment later was corrected due to a clerical error in the name of the plaintiff in the original assignment. Copies of the note, mortgage, assignment, and corrected assignment were annexed to the plaintiff's motion for summary judgment as exhibits.

In 2009, the defendant defaulted pursuant to the terms of the note and mortgage, and the plaintiff notified her of the default. The notice of default advised that if the amount required to cure the default was not received within sixty days, immediate acceleration of all moneys due under the note and mortgage could be declared without further notice or demand. Piz further avers that the defendant failed to cure her default and, as a result, the plaintiff elected to accelerate the total amount of the indebtedness due and owing by commencing this action. No part of the outstanding indebtedness has been paid by the defendant. Subsequently, the defendant received multiple notices of her default, including notices on November 30, 2009, January 21, 2010, and May 10, 2010.

Piz further alleges that the plaintiff is in physical possession of the original loan documents, including, without limitation, the original note endorsed in blank, and was in possession of the same at the time this action was commenced.[6]

Piz also addresses in his affidavit what transpired regarding the defendant's application for a HAMP loan modification. On July 15, 2010, the plaintiff sent the defendant a letter offering her a trial period plan (TPP). A copy of this letter is annexed to the motion for summary judgment. It reads, in pertinent part: "You are approved to enter into a [TPP] under [HAMP]. This is the first step toward qualifying for more affordable mortgage payments. . . . To accept this offer, you must make new monthly 'trial period payments' in place of your normal monthly mortgage payment. . . . After all trial period payments are timely made and you continue to meet all program eligibility requirements, your mortgage would then be permanently modified. You will be required to execute a permanent mortgage modification agreement that we will send you before your modification becomes effective. Until then, your existing loan and loan requirements remain in effect and unchanged during the trial period. If each trial payment is not received by us in the month in which [it] is due, this offer will end and your loan will not be modified under [HAMP]." (Emphasis omitted.) The letter also includes answers to "frequently asked questions," one of which advised the borrower that "[y]our credit score may be affected by accepting a [TPP] or modification." In response to a question, "[w]hen will I know if my loan can be modified permanently and how will the modified loan balance be determined?" the letter provided, "[o]nce we confirm you are still

eligible for [HAMP] and you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan."[7]

Piz further avers in his affidavit that in or about May and June, 2011, the defendant sent the plaintiff evidence of her combined income with her then "spouse,"[8] and that, on the basis of the defendant's profit and loss statement and pay stubs, the plaintiff calculated that the defendant and her "spouse" had a combined monthly income of $13,826.35 and a total housing expense of $3423.94. Thus, the defendant's "housing ratio," or housing expense as a percentage of household income, was 24.76 percent. Under the then applicable HAMP guidelines, the borrower's current monthly mortgage payment could not be less than 31 percent of the borrower's household monthly gross income to qualify for a loan modification.

Consequently, the plaintiff concluded that "[b]orrower [h]ousing [r]atio exceeds the maximum for our lending program." In addition, the plaintiff submitted a handbook for the HAMP program, version 3.2, which indicated that one of the requirements under the program was that "verified income documentation must confirm that the borrower's monthly mortgage payment ratio prior to the modification is greater than 31 percent." On July 15, 2011, the plaintiff sent the defendant a letter explaining that the defendant had been denied a permanent modification because her "housing ratio[9] exceeds the maximum allowed for the modification program." The plaintiff sent another letter to the defendant on July 28, 2011, explaining in greater detail why the defendant's housing ratio made her ineligible for a loan modification under HAMP. Although the reference in the July 15, 2011 letter to a "housing ratio that exceeds the maximum allowed" is confusing, the July 28, 2011 letter clearly explains why the defendant's housing expense was not a large enough percentage of her household income to qualify for a loan modification.

The defendant filed her objection to the motion for summary judgment on January 11, 2016, essentially asserting that the evidence relevant to her special defenses and counterclaim, which involve the plaintiff's course of conduct in considering and ultimately denying her loan modification application, creates a genuine issue of material fact as to whether the plaintiff should be permitted to proceed to foreclosure.

The defendant attached her own affidavit to her objection to the motion for summary judgment, summarized as follows. She faithfully submitted her mortgage payments in a timely fashion and without incident until late 2009. In the beginning of 2009, she was laid off from her job and forced to use her cash reserves and savings to make her payments. She became concerned about her continued ability to make her payments. In the fall of 2009, she contacted her loan servicer, Chase,

to discuss mortgage assistance options and was told by a representative that Chase would not speak to her unless or until she stopped making her payments. As a result of her reliance on this information, she stopped making any payments commencing on October 1, 2009. The plaintiff did not follow through with its promise to help her with mortgage assistance, and she had to retain a law firm to help her. Starting in March, 2010, and continuing until July, 2010, she supplied the plaintiff with all of the financial information it requested of her.

The defendant attached additional documentation to her objection to the plaintiff's summary judgment motion, focusing on her participation in the TPP and the plaintiff's denial of her application for a loan modification. After the defendant retained counsel, the plaintiff finally sent the defendant a letter dated July 15, 2010, congratulating her and stating that she was "approved to enter into a [TPP] under the [HAMP] (program)," and explaining that "[t]his is the first step toward qualifying for more affordable mortgage payments. . . . After all trial period payments are timely made and you continue to meet all program eligibility requirements, your mortgage would then be permanently modified. You will be required to execute a permanent mortgage modification agreement that we will send you before your modification becomes effective. Until then, your existing loan and loan requirements remain in effect and unchanged during the trial period." Under the plan, the defendant was to make three consecutive monthly payments of $3373.86 on August 1, September 1, and October 1, 2010.

In her affidavit, the defendant avers that she timely made all three payments under the TPP and some additional trial payments into 2011.[10] The plaintiff continued to send her letters on different letterhead and from different locations, asking her for the same financial information and thanking her for her interest in a HAMP modification. According to the defendant, to be safe, she kept resending the requested information to the plaintiff. She also avers that she received two notices that her request for unemployment forbearance had been received even though she had never made any such request. Finally, the defendant avers that the plaintiff, approximately nine months after the TPP had ended, sent her a letter dated July 15, 2011, which stated that "[w]e received your request for a permanent loan modification . . . . We are unable to offer you a modification through the federal [program] . . . . This decision was confirmed through a second level of review. . . . We are unable to offer you a modification because your housing ratio exceeds the maximum allowed for the modification program." The letter also recommended other possible options for the defendant to avoid foreclosure.

As part of her objection to the plaintiff's motion for

summary judgment, the defendant also submitted internal documents of the plaintiff and a number of other letters sent to her by the plaintiff. The plaintiff does not dispute the existence or accuracy of these documents or letters, which reveal the following. In or about June and July, 2010, the defendant submitted to the plaintiff a loan modification application with supporting documents. The plaintiff reviewed these submissions, which included bank statements from the defendant's business from February through May, 2010, and a contribution letter and pay stubs from the defendant's fiancé from May and June, 2010.[11] The analysis, called an "MOD Summary Report," revealed that the defendant's housing ratio was 37.892 percent, which was within HAMP's limits for approval of a loan modification. As a result, the plaintiff forwarded the defendant a letter offering her a TPP. In August, 2010, the plaintiff sent the defendant a letter requesting a packet of financial information regarding her loan modification request. In September, 2010, the plaintiff sent the defendant another letter stating that it was still waiting for the requested package of information to be returned. In and about February and March, 2011, according to an updated MOD Summary Report, the plaintiff again reviewed the defendant's application, determined that her housing ratio was 31.208 percent, which was still within HAMP limits, and, the defendant claims, approved her pending application for a loan modification. On March 10, 2011, the plaintiff entered the following messages into its Loss Mitigation Tracking Steps system: "Final Review Complete," "Order/Prepare Mod Docs," and "QA Final Approved," which corresponded to a charge of $2838.92 to the defendant's bank account. There is no dispute that the plaintiff never sent the defendant any permanent loan modification documents. The Loss Mitigation Tracking Steps later reflect that on July 11, 2011, the defendant was found ineligible for a loan modification.[12]

In its reply to the defendant's opposition to the motion for summary judgment, the plaintiff claimed that despite the defendant's allegations of the plaintiff's internal generation of alleged final loan modification documents, the defendant admits she never received or accepted the final loan modification documents. The plaintiff also argued that the defendant's special defenses do not relate to the making, validity or enforcement of the note, and that her counterclaim does not have a sufficient connection to the making, validity or enforcement of the note and mortgage to satisfy the "transaction test" in Practice Book § 10-10.[13]

On May 23, 2016, the court held a hearing on the plaintiff's motion for summary judgment. After oral argument, the defendant filed a supplemental brief in opposition to the motion for summary judgment on May 23, 2016. Following the hearing, the court summarily granted the plaintiff's motion for summary judgment. On July 8, 2016, the defendant filed a motion for clarifi-

cation of whether the court's order granting the summary judgment motion pertained to her counterclaim. The court issued an order on September 8, 2016, stating that its ruling included rendering summary judgment on the defendant's counterclaim. On September 12, 2016, the court rendered judgment of strict foreclosure with a law day of December 5, 2016. This appeal followed.

Thereafter, on October 27, 2016, the defendant filed a motion for articulation of the court's granting of the plaintiff's motion for summary judgment. The defendant requested that the court articulate its "findings of fact and conclusions of law upon which the trial court relied in granting the motion for summary judgment as to the special defenses and counterclaim of the defendant . . . ." (Emphasis omitted.) On February 15, 2017, the court issued an articulation. In its articulation, the court determined that "the plaintiff has established the absence of a genuine issue of material fact regarding the prima facie case for foreclosure," and that none of the defendant's special defenses raised a genuine issue of material fact that might defeat the plaintiff's cause of action. The court also concluded that summary judgment was appropriate on the defendant's breach of contract counterclaim. The court determined that the undisputed facts show that the parties did not enter into a new contract and that the defendant's counterclaim regarding the denial of her application for a loan modification did not present an issue that satisfied the transaction test in Practice Book § 10-10. Finally, the court ruled that even if the transaction test were satisfied, the counterclaim was barred by the statute of frauds, General Statutes § 52-550, because the amount due on the note was $480,000, which exceeds the threshold amount of $50,000 for loan agreements in the statute, and thus any contract for a modification needed to be in writing.

We first set forth the applicable standard of review. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Rosenfield* v. *I. David Marder & Associates, LLC*, 110 Conn. App. 679, 684, 956 A.2d 581 (2008). A material fact is one that makes a difference in the outcome of a case. *Catz* v. *Rubenstein*, 201 Conn. 39, 48, 513 A.2d 98 (1986).

"Summary judgment shall be granted if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . The trial court must view the evidence in the light most favorable to the nonmoving party. . . .

"Appellate review of the trial court's decision to grant summary judgment is plenary. . . . [W]e must [therefore] decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Citations omitted; internal quotation marks omitted.) *McFarline* v. *Mickens*, 177 Conn. App. 83, 90, 173 A.3d 417 (2017), cert. denied, 327 Conn. 997, 176 A.3d 557 (2018).

"In order to establish a prima facie case in a mortgage foreclosure action, the plaintiff must prove by a preponderance of the evidence that it is the owner of the note and mortgage, that the defendant mortgagor has defaulted on the note and that any conditions precedent to foreclosure, as established by the note and mortgage, have been satisfied. . . . Thus, a court may properly grant summary judgment as to liability in a foreclosure action if the complaint and supporting affidavits establish an undisputed prima facie case and the defendant fails to assert any legally sufficient special defense." (Internal quotation marks omitted.) *Wells Fargo Bank, N.A.* v. *Strong*, 149 Conn. App. 384, 392, 89 A.3d 392, cert. denied, 312 Conn. 923, 94 A.3d 1202 (2014).

"[A] holder of a note is presumed to be the owner of the debt, and unless the presumption is rebutted, may foreclose the mortgage under [General Statutes § 49-17]. . . . It [is] for the defendant to set up and prove the facts which limit or change the plaintiff's rights." (Internal quotation marks omitted.) *Equity One, Inc.* v. *Shivers*, 310 Conn. 119, 135, 74 A.3d 1225 (2013).

"[T]he party raising a special defense has the burden of proving the facts alleged therein." *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 308 Conn. 719, 736, 66 A.3d 848 (2013). "If the plaintiff in a foreclosure action has shown that it is entitled to foreclose, then the burden is on the defendant to produce evidence supporting its special defenses in order to create a genuine issue of material fact . . . ." *WM Specialty Mortgage, LLC* v. *Brandt*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-09-5001157-S, 2009 WL 567040, *4 (February 10, 2009); see *Union Trust Co.* v. *Jackson*, 42 Conn. App. 413, 417–20, 679 A.2d 421 (1996). Legally sufficient special defenses alone do not meet the defendant's burden. "The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . Further . . . [t]he applicable rule regarding the material facts to be considered on a motion for summary judgment is that the facts at issue are those alleged in the pleadings." (Citation omitted; internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky*, 72 Conn. App. 700, 718, 807 A.2d 968, cert. denied, 262 Conn.

915, 811 A.2d 1291 (2002). "[B]ecause any valid special defense raised by the defendant ultimately would prevent the court from rendering judgment for the plaintiff, a motion for summary judgment should be denied when any [special] defense presents significant fact issues that should be tried." (Internal quotation marks omitted.) *Ulster Savings Bank* v. *28 Brynwood Lane, Ltd.*, 134 Conn. App. 699, 704, 41 A.3d 1077 (2012).

I

First, the defendant claims that the court improperly rendered summary judgment against her as to liability on the foreclosure complaint because genuine issues of material fact exist with respect to her special defenses of equitable estoppel, breach of the covenant of good faith and fair dealing, promissory estoppel, unclean hands, and breach of contract. We agree with the defendant that her special defense of unclean hands raises a genuine issue of material fact, and therefore, summary judgment in favor of the plaintiff should not have been rendered. We disagree, however, that the remainder of the defendant's special defenses precluded summary judgment in the plaintiff's favor.

A

The defendant claims in her fifth special defense that the plaintiff violated the doctrine of unclean hands and should be precluded from proceeding with the foreclosure action because the plaintiff did not offer her a permanent loan modification under the program despite the fact that, pursuant to regulations published by the United States Department of the Treasury, she was entitled to a permanent modification upon the completion of her three trial payments. She argues that instead, the plaintiff placed her into a mortgage forbearance program for which she did not apply. She contends that the plaintiff's internal records indicate that it approved her for a loan modification under the program in March, 2011, months before it mailed her the denial letter. She argues that a number of documents in evidence suggest that the plaintiff approved the defendant for a loan modification in March, 2011, when she had a housing ratio of 31.2 percent. She notes that the plaintiff only appended evidence to its motion for summary judgment that supported its version of the narrative while failing to make any argument or even reference to its own internal processes, evidence of which raises more questions than answers. We agree with the defendant.

Because an action to foreclose a mortgage is an equitable proceeding, the doctrine of unclean hands may be applicable. "It is a fundamental principle of equity jurisprudence that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . .

It is applied not by way of punishment but on considerations that make for the advancement of right and justice. . . . The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Citation omitted; internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001). "The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 407, 867 A.2d 841 (2005). "Wilful misconduct has been defined as intentional conduct designed to injure for which there is no just cause or excuse. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. . . . Not only the action producing the injury but the resulting injury also must be intentional." (Internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 630–31 n.10, 987 A.3d 1009 (2010).

This special defense questions the legitimacy of the plaintiff's processing of the defendant's application for a loan modification. It raises a question as to why the plaintiff failed to send the defendant a permanent loan modification agreement if she was approved for a loan modification in March, 2011. The court rejected the defendant's special defense of unclean hands and characterized it as another "inducement to default" special defense, similar to the defendant's equitable estoppel special defense. We, however, conclude that the nature of the allegations in this special defense are distinguishable.

The defendant submitted as evidence a copy of a supplemental directive issued on January 28, 2010, by the Treasury Department to provide guidance to loan servicers in making HAMP eligibility determinations for borrowers currently participating in a TTP. This directive notes a change from a prior directive issued in 2009, which gave loan servicers the option of placing a borrower into a TPP on the basis of verbal financial information obtained from the borrower, subject to later verification during the TPP. Effective on or after June 1, 2010, a loan servicer was instructed to evaluate a borrower for HAMP only after the servicer received an initial package that included a request for modification and an "affidavit (RMA) form," an Internal Revenue

Service form 4506-T or 4506T-EZ to request transcripts of tax returns, and documentation of income that may not be more than ninety days old as of the date the initial package is received by the servicer. If the loan servicer received an incomplete initial package or needed additional documentation to verify the borrower's eligibility and income, the servicer had to send the borrower an "Incomplete Information Notice" that lists the additional required verification documentation. Loan servicers were required to use a two step process for HAMP modifications. In referencing conversion from trial to permanent modification, the directive stated: "Following underwriting and a determination that the borrower qualifies for a HAMP trial modification, servicers will place qualified borrowers in a trial period plan by preparing and sending a [TPP] [n]otice to the borrower describing the terms of the trial modification and the payment due dates. Borrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent HAMP modification."

In this case, the plaintiff produced no evidence that it made a determination as to the defendant's eligibility for a HAMP modification at the end of her TPP, which was at the end of the month in which she made her third payment, October, 2010. Furthermore, there is evidence in the defendant's submissions that the defendant's application was approved by the plaintiff in March, 2011, and the plaintiff has produced no evidence to explain why it failed, at that time, to complete the process and forward to the defendant an offer of a permanent loan modification. In addition, there is no evidence that the plaintiff ever sent the defendant the required "Incomplete Information Notice" that her documentation was incomplete, as required by the directive.

The plaintiff's failure to establish that it adhered to the Treasury Department's directives, which appear to encourage that final determinations on whether to offer the borrower a loan modification be made before the end of the TPP, and the plaintiff's failure to provide an explanation as to its apparent internal approval of the loan modification in March, 2011, which was not communicated to the defendant, create a genuine issue of material fact as to whether the defendant can prevail on her special defense of unclean hands. When viewing the evidence in the light most favorable to the defendant, the unexplained length of time it took the plaintiff to deny the defendant an offer of a permanent modification, almost twenty months, commencing with the date it told her that the only way to explore modification of her loan was to stop paying in November, 2009, and ending with the date it denied her a modification, July 15, 2011, raises the question of whether the plaintiff treated the defendant in a fair, equitable and honest manner knowing that prolonged delay would place the

defendant in an untenable financial situation, such that she could not possibly extricate herself to prevent foreclosure. We have no evidentiary basis to determine if wilful misconduct or simple negligence occurred in the plaintiff's handling of her application.

We, therefore, conclude that the court erred in determining that there was no genuine issue of material fact as to whether the defendant can prevail on her special defense of unclean hands.

B

Having concluded that there is a genuine issue of material fact raised in the allegations in the defendant's unclean hands special defense, we next address the plaintiff's argument that this special defense is invalid because it does not relate to the making, validity, or enforcement of the note and mortgage.[14] The court did not expressly address or rely on this rationale, but we address it because it presents a question of law that is subject to plenary review. See, e.g., *TD Bank, N.A.* v. *M.J. Holdings, LLC*, 143 Conn. App. 340, 343, 70 A.3d 156 (2013) (issues concerning legal sufficiency of pleading subject to plenary review). In mortgage foreclosure cases, "courts require that a viable legal defense directly attack the making, validity or enforcement [of the note and mortgage]." (Internal quotation marks omitted.) *CitiMortgage, Inc.* v. *Rey*, 150 Conn. App. 595, 603, 92 A.3d 278, cert. denied, 314 Conn. 905, 99 A.3d 635 (2014). "[S]pecial defenses which are not limited to the making, validity or enforcement of the note or mortgage fail to assert any connection with the subject matter of the foreclosure action and as such do not arise out of the same transaction as the foreclosure action." (Internal quotation marks omitted.) Id., 600.

In *U.S. Bank National Assn.* v. *Sorrentino*, 158 Conn. App. 84, 97, 118 A.3d 607, cert. denied, 319 Conn. 951, 125 A.3d 530 (2015), this court concluded that counterclaims that addressed the plaintiff's alleged improper conduct concerning the defendants' qualification for a possible loan modification during a foreclosure mediation program that began after the execution of the note and mortgage did "not reasonably relate to the making, validity or enforcement of the note or mortgage," and, thus, could not be joined properly with the complaint. Recently, in *U.S. Bank National Assn.* v. *Blowers*, 177 Conn. App. 622, 625–26, 172 A.3d 837, cert. granted, 328 Conn. 904, 177 A.3d 1160 (2018), an appeal from a judgment of strict foreclosure, this court held that the trial court properly granted the plaintiff's motion to strike the defendants' special defenses and counterclaims. The counterclaims sounded in negligence; violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.; and unjust enrichment. *U.S. Bank National Assn.* v. *Blowers*, supra, 626. The special defenses sounded in equitable estoppel, unjust enrichment and unclean hands. Id. The defen-

dants in *Blowers* claimed that shortly after they had defaulted on their mortgage payments, a servicing agent for the plaintiff reached out to the defendants, offering a rate reduction. Id., 628. After the defendants successfully completed a three month trial modification period, however, the plaintiff withdrew its offer to modify the loan and ultimately commenced a foreclosure action. Id. The defendants essentially claimed that the plaintiff and its servicing agent failed to conduct themselves in a manner that was fair, equitable and honest during the court mediation and loan modification negotiation period. Id. Relying on *U.S. Bank National Assn.* v. *Sorrentino*, supra, 96, this court held that the alleged improper conduct occurring during mediation and modification negotiations lacked "a reasonable nexus to the making, validity, or enforcement of the note or mortgage." *U.S. Bank National Assn.* v. *Blowers*, supra, 632. By contrast, if "the modification negotiations ultimately result in a final, binding, loan modification, and the mortgagee subsequently breaches the terms of that new modification, then any special defenses asserted by the mortgagor in regard to that breach would relate to the enforcement of the mortgage."[15] Id., 630.

The court in *Blowers* further noted that "our courts have allowed exceptions to the making, validity, or enforcement requirement where traditional notions of equity would not be served by its strict application. For example, in *Thompson* v. *Orcutt*, [supra, 257 Conn. 301], our Supreme Court reversed this court's determination that a special defense of unclean hands did not apply where the plaintiff's fraudulent conduct occurred in a separate bankruptcy proceeding that was not strictly related to the making, validity, or enforcement of the note or mortgage. In reversing this court's decision, the Supreme Court observed that the plaintiff would not have had the legal authority to bring the foreclosure action against the defendants but for its fraudulent conduct during the bankruptcy proceeding. . . . The court [in *Thompson*] noted, [b]ecause the doctrine of unclean hands exists to safeguard the integrity of the court . . . [w]here a plaintiff's claim grows out of or depends upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief, and will leave him to whatever remedies and defenses at law he may have." (Citation omitted; internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 633–34. Our Supreme Court further clarified that an equitable defense of unclean hands need not strictly relate to the making, validity, or enforcement of the note or mortgage, provided the allegations set forth were "directly and inseparably connected" to the foreclosure action. (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, supra, 313. Thus, we are not persuaded by the plaintiff's argument that the defendant's unclean hands defense is invalid because it does not relate to the making, validity, or enforcement

of the note. First, the defense of unclean hands, as our Supreme Court recognized, does not necessarily need to relate to the making, enforcement, or validity of the loan. Second, if the plaintiff did engage in fraudulent conduct by deliberately failing to communicate its internal approval of the loan modification, then that raises questions as to whether, but for this conduct, the plaintiff would have had the legal authority to bring this action.

We conclude that the allegations in the defendant's special defense of unclean hands raise a genuine issue of material fact as to whether deceitful or unfair practices on the part of the plaintiff led to the filing of a foreclosure action that could have been avoided by the timely processing of the defendant's application for a permanent loan modification in accordance with the HAMP guidelines. The plaintiff's submissions do not satisfactorily defeat the evidence set forth in the defendant's objection that HAMP's required procedures may not have been followed during the TPP process. Thus, the court erred in rendering summary judgment in favor of the plaintiff in light of the defendant's unclean hands special defense.

C

Because we conclude that the case is to be remanded for further proceedings, it is appropriate for us to address certain issues raised by the defendant that are likely to recur on remand. See *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164, 971 A.2d 676 (2009). The defendant claims that the court erred in concluding that her equitable estoppel special defense failed to raise a genuine issue of material fact as to whether the plaintiff induced her default. In this special defense, the defendant alleges that the plaintiff advised her that she had to stop making her mortgage payments, as this was the only way to explore a modification. She claims that the plaintiff should be equitably estopped from foreclosing on her mortgage because "the event of default was contrived by [the plaintiff]," who "reported the default to various credit reporting agencies . . . which substantially interfered with her ability to . . . pursue refinancing options with other financial institutions." We are not persuaded.

"The doctrine of equitable estoppel is well established. [W]here one, by his words or actions, intentionally causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is [precluded] from averring a different state of things as existing at the time. . . . Our Supreme Court . . . stated, in the context of an equitable estoppel claim, that [t]here are two essential elements to an estoppel: the party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and

to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. . . . Broadly speaking, the essential elements of an equitable estoppel . . . as related to the party to be estopped, are: (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *M.J. Holdings, LLC*, 143 Conn. App. 322, 337–38, 71 A.3d 541 (2013). "Estoppel rests on the misleading conduct of one party to the prejudice of the other." (Internal quotation marks omitted.) *Fischer* v. *Zollino*, 303 Conn. 661, 668, 35 A.3d 270 (2012).

In opposing summary judgment, the defendant argued that the plaintiff should be equitably estopped from bringing the foreclosure action because she withheld mortgage payments beginning in October, 2009, only after the plaintiff advised her "that in order to discuss modification options, she would have to default on her mortgage by withholding payment." In her affidavit that was submitted to the court in support of her opposition to the plaintiff's motion for summary judgment, the defendant averred that she had called the plaintiff in the fall of 2009, and further averred: "I was told by the representative with whom I spoke that [the plaintiff] would not speak to me about mortgage assistance unless or until I stopped making my payments."

On appeal, the defendant claims as grounds for equitable estoppel that she was not in default and had not missed any mortgage payments in the past but that when she reached out to the plaintiff to inquire about modifying her monthly payments, it instructed her to stop making her payments, as this was the only way to explore a modification. She claims, for the first time on appeal, that this was a misleading statement by the plaintiff because, under the HAMP program standards, she only needed to be at imminent risk of default and did not have to be in default in order to be considered for a modification. She also claims that her default, contrived by the plaintiff, negatively impacted her credit score, and thus her ability to pursue refinancing with other financial institutions.

A major problem with the defendant's claim that the plaintiff *misled* her by telling her she first had to stop making payments to be considered for a loan modification, rather than merely be at imminent risk of default, is that she raises this argument for the first time on

appeal.[16] "Our appellate courts, as a general practice, will not review claims made for the first time on appeal. We repeatedly have held that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619, 99 A.3d 1079 (2014). We also do not consider evidence not presented to the trial court. See *O'Hara* v. *State*, 218 Conn. 628, 639–40 n.8, 590 A.2d 948 (1991). In the present case, the argument that the defendant made in her opposition to summary judgment was that the plaintiff's servicer had a widespread practice of instructing mortgagors to stop making mortgage payments under the false pretense that doing so would not hurt their credit scores. In the portion of her memorandum of law in opposition to the motion for summary judgment where she discusses her equitable estoppel special defense, the defendant never directs the court's attention to any authority that supports her appellate contention that the plaintiff knew or should have known that telling her she had to stop payments as a requirement to be considered for a loan modification was misleading. Accordingly, the claim as framed on appeal is unpreserved.

Assuming, arguendo, that the defendant had preserved her equitable estoppel claim, we would conclude that she cannot prevail on the merits of the defense as currently pleaded and argued. The following additional facts pertaining to the defendant's decision to default are relevant to this claim. In her affidavit, the defendant states that after she was laid off from her job, she used cash reserves and savings to make her mortgage payments, but soon became concerned about her ability to continue making the payments. In her affidavit, the defendant avers that the plaintiff's loan servicer did not direct her to default, but rather informed her that it could not speak with her regarding loan assistance until she was in default. Thereafter, the defendant elected to default and was not coerced or forced to do so by the plaintiff.

This special defense fails to allege that the plaintiff promised her that her credit score would be unaffected by her default, and the only detriment she alleges was the negative impact on her credit score. In her equitable estoppel special defense, the defendant also does not claim that the plaintiff promised her a loan modification when it instructed her that the only way to explore modifying her payment was for her to default.

After the defendant defaulted, the plaintiff followed through on its promise to discuss mortgage assistance with the defendant, and engaged in documented communications, internal calculations and correspondence with the defendant in an effort to conclude a mortgage modification.

Because the allegations in this special defense in no

way set forth a claimed promise from the plaintiff that her credit score would be unaffected or that a future loan modification would take place if she defaulted and there is no evidence of any such promises, the defendant cannot claim that she relied to her detriment on promises she fails to allege or prove existed. At the time the defendant elected to default, the maintenance of a favorable credit score or a loan modification were never certainties, and she chose to default at her own peril. The defendant has failed to plead or present evidence of a promise or reasonable reliance on any promise.

*Carlson* v. *Bank of America, N.A.*, United States District Court, Civ. No. 12-1440 (DSD/AJB), 2012 WL 5519733 (D. Minn. November 14, 2012), is factually analogous and provides further justification for why the defendant's "induced to default" special defense is insufficient for lack of proof of detrimental reliance on her part. The court in *Carlson* stated: "The homeowners argue that Bank of America fail[ed] to properly communicate with plaintiffs and encourag[ed] plaintiffs to default on their loan. . . . Absent from the verified complaint, however, is any allegation that Bank of America hindered performance by refusing payment. . . . In other words, the homeowners never alleged that the lender's actions prevented them from performing their responsibilities under the mortgage agreement. . . . For this reason, the homeowners' claim fails. . . .

"Here, the homeowners did not plead plausible factual allegations indicating that they would have been able to pay the mortgage absent their reliance on the instructions to default. . . . The homeowners allege that they would have continued to make payments had they not been instructed to default on the loan; however, they also allege financial concerns beginning in fall 2009 and do not allege an ability to pay." (Citations omitted; internal quotation marks omitted.) Id., *2.

*Carlson* is instructive. In rejecting the defendant's "instruction to default" defense therein, the court found that the defendant's own admitted financial problems were the undisputed overriding impetus for the defendant's decision to default on the note and mortgage. Similarly, the defendant in the present case has not presented evidence that she could have or would have remained current on the mortgage had she not been instructed to default to take advantage of the opportunity for a modification. The fact that she claims she was current on certain other financial obligations while she was in default does not equate to an ability to pay her mortgage. As the plaintiff points out, the defendant's argument is "self-contradictory and illogical." On the one hand, the defendant claims that she defaulted only because she was wrongfully induced to default by the plaintiff and would not have defaulted but for plaintiff's

supposedly inequitable conduct. On the other hand, she claims she should have been considered for a modification before defaulting, but the HAMP guidelines only permit predefault modification consideration if the borrower's default is imminent. If, in 2009, the defendant was about to default in the near future, how can she argue that the plaintiff's actions were the wrongful cause of her default? If she was able to continue to afford her mortgage payments and only was induced by the plaintiff to default, then her default was not imminent, and presumably she could have afforded the existing terms of her mortgage and would not have been eligible for HAMP. See *Pennington* v. *HSBC Bank USA, N.A.*, 493 Fed. Appx. 548, 553 (5th Cir. 2012) (noting borrower could not have possibly qualified for HAMP if her claim that she would not have missed payment but for servicer's "demand that she quit making her regular monthly payments" were true [internal quotation marks omitted]), cert. denied, 568 U.S. 1161, 133 S. Ct. 1272, 185 L. Ed. 2d 185 (2013).

D

We next address the defendant's claim that a genuine issue of material fact exists with respect to her breach of contract special defense. She argues that her submissions give rise to a genuine issue of material fact as to whether the plaintiff breached its contract with her by failing to offer her a permanent loan modification. She alleges in this special defense that the July 15, 2010 TPP created an offer from the plaintiff that if all trial period payments were timely made, her mortgage would be permanently modified.[17]

"[D]ue to the adversarial nature of our judicial system, [t]he court's function is generally limited to adjudicating the issues *raised by the parties* on the proof they have presented . . . . Connecticut is a fact pleading jurisdiction. . . . Pleadings have an essential purpose in the judicial process. . . . The purpose of pleading is to apprise the court and opposing counsel of the issues to be tried . . . . For that reason, [i]t is imperative that the court and opposing counsel be able to rely on the statement of issues as set forth in the pleadings. . . . Fairness is a double-edged sword and both sides are entitled to its benefits throughout the trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Somers* v. *Chan*, 110 Conn. App. 511, 528–29, 955 A.2d 667 (2008); see also 71 C.J.S. 33, Pleading § 2 (2011) ("purpose of pleadings is to frame, present, define, and narrow the issues and to form the foundation of, and to limit, the proof to be submitted").

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Pelletier* v. *Galske*, 105 Conn. App. 77, 81, 936 A.2d 689 (2007), cert. denied, 285 Conn. 921, 943 A.2d 1100 (2008). The

promise of an offer of a loan modification must be pleaded as enforceable by the terms of the agreement. See *Everbank* v. *Engelhard*, Superior Court, judicial district of Waterbury, Docket No. CV-13-6019881, 2016 WL 4507540, *4 (July 28, 2016).

The defendant avers that the plaintiff breached the terms of the TPP letter. The plaintiff argues that it was the defendant's failure to perform a condition precedent—maintaining her financial eligibility for HAMP—that resulted in the rejection of her application for a permanent loan modification. There is no dispute that maintaining eligibility for HAMP was a condition precedent in the TPP letter, and, because the defendant failed to allege her compliance with this condition precedent in her breach of contract special defense, her argument necessarily fails because she failed to allege full performance on her part.[18] Thus, by her own allegations, her conduct never triggered the plaintiff's duty to perform its obligations under the contract, rendering this defense as currently pleaded legally insufficient.

E

We next address whether the court erred in concluding that there was no genuine issue of material fact as to the defendant's special defense of breach of the covenant of good faith and fair dealing. We are not persuaded by the defendant's arguments.

The defendant claims that the plaintiff violated its duty of good faith and fair dealing by instructing her to default on her mortgage, on which she then was current, as a precondition to discussing a loan modification; and by failing to advise her of the risks that would result from her failure to make her monthly mortgage payments—the acceleration of the debt, the application of default interest, the assessment of penalties and late fees, and unfavorable reports to credit agencies. She further alleges that the instruction to default delivered to her by the plaintiff was made in bad faith and motivated by financial gain on behalf of the plaintiff, to wit, the promise of financial incentives from the Treasury Department, to modify the loan.[19]

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to

receive under the contract must have been taken in bad faith. . . .

"Bad faith has been defined in our jurisprudence in various ways. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 42–43, 925 A.2d 334 (2007). In general, bad faith "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *J & M Holdings, LLC*, supra, 143 Conn. App. 348.

The defendant argues that a genuine issue of material fact exists as to whether the plaintiff violated the covenant of good faith and fair dealing. Specifically, she argues that the plaintiff acted in bad faith when it instructed her to default on her mortgage as a precondition to discussing loan modification.[20]

Viewing this special defense in the light most favorable to the defendant, we will presume that she is claiming that the plaintiff breached the implied covenant of good faith and fair dealing in the note and mortgage agreements because there must be an existing contract in order for there to be a breach of the implied covenant, and the defendant does not allege the existence of any other contract in this special defense. "[T]he existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing. . . . [N]o claim of breach of the duty of good faith and fair dealing will lie for conduct that is outside of a contractual relationship." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Carford* v. *Empire Fire & Marine Ins. Co.*, 94 Conn. App. 41, 45–46, 891 A.2d 55 (2006). Because a special defense admits the facts pleaded in the complaint, and the complaint alleges the existence of note and mortgage agreements, we fairly can make this presumption.[21]

We agree with the plaintiff that there is no evidence that it impeded the defendant's rights under the note or mortgage or that it acted in bad faith. As detailed in part I C of this opinion, there is no evidence that the plaintiff misled the defendant into defaulting; rather, she elected to default. See part I C of this opinion. The note and mortgage, which the defendant signed, made clear the consequences of default. Commencing on November 30, 2009, the first month in which the defen-

dant stopped making her mortgage payments, the plaintiff sent the defendant numerous notices of default, including several notices that predated her application for a loan modification. These letters advised the defendant of the consequences of her default, as required by the terms of the note and mortgage. The note and mortgage, however, do not require the plaintiff to notify her that her credit rating may be affected were she to be in default. Once the defendant defaulted, the plaintiff discussed mortgage assistance and gave the defendant a TPP, as promised. Although the defendant makes the sweeping generalization that many mortgage servicers are motivated to induce defaults for greater fees, there is no evidence that any employee of Chase, acting on behalf of the plaintiff, was so motivated in this case. Moreover, neither the note nor the mortgage contemplate addressing a situation where the defendant might need relief from the payment provisions, nor does either of these documents promise to offer the defendant a loan modification. Accordingly, a failure to provide the defendant with an offer for a loan modification under the program cannot be a violation of the covenant of good faith and fair dealing under the note or mortgage agreements.

F

The defendant also claims that the court erred in determining that there was no genuine issue of material fact regarding her promissory estoppel special defense.[22] She contends that submissions presented to the court show that the plaintiff promised to offer to permanently modify her loan if she made three trial period payments and met the eligibility requirements of the TPP, but that the plaintiff did not fulfill its promise to modify her mortgage after she made the payments and met the requirements. We are not persuaded because the allegations in this special defense, which state that the defendant was promised a permanent modification of her mortgage so long as she made three consecutive trial payments in a specified amount, are contradicted by the undisputed evidence. In reviewing the language of this particular special defense, it is not asserted that the defendant met all the terms of the purported offer she submitted as evidence.

"[U]nder the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. . . . A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all. . . .

"Additionally, the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future. . . . [A] mere expression of intention, hope, desire, or opinion, which shows no real commitment, cannot be expected to induce reliance . . . and, therefore, is not sufficiently promissory. The requirements of clarity and definiteness are the determinative factors in deciding whether the statements are indeed expressions of commitment as opposed to expressions of intention, hope, desire or opinion. . . . Finally, whether a representation rises to the level of a promise is generally a question of fact, to be determined in light of the circumstances under which the representation was made." (Citations omitted; internal quotation marks omitted.) *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 104–106, 837 A.2d 736 (2003). "[A] promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987).

Again, the defendant's claim is limited to the allegations she made in her promissory estoppel defense. See *Somers* v. *Chan*, supra, 110 Conn. App. 528–29. It is undisputed that the defendant made all of the trial period payments on time. According to the July 15, 2010 letter, however, the defendant also was required to continue to meet the eligibility requirements of the program. Both parties submitted a letter dated July 15, 2010, addressed to the defendant from the plaintiff, in which the plaintiff states that the defendant was approved to enter into a trial period plan, and explained that "[a]fter all trial period payments are timely made *and you continue to meet all program eligibility requirements*, your mortgage would then be permanently modified." (Emphasis added.) The plaintiff further explained in the letter that "[o]nce we confirm you are still eligible for a Home Affordable Modification and you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan."

The undisputed evidence reveals that the defendant was required to continue to meet the requirements of the program in order to qualify for a permanent modification. The plaintiff contends that she did not satisfy the requirement that her housing ratio be greater than 31 percent.[23] In her claim of promissory estoppel, the defendant does not allege that she fulfilled that condition and, thus, did not satisfy all the conditions precedent in the TPP to receive an offer of a permanent loan modification. Accordingly, the plaintiff did not break any promise to the defendant by declining to modify her loan under the program. As such, the party against whom estoppel is claimed, the plaintiff, indisputably

never promised to form a binding modification agreement once the defendant made her three consecutive trial period payments because those payments were not the only contingency.

The court properly concluded that the defendant's promissory estoppel special defense as currently pleaded did not raise a genuine issue of material fact that would preclude the rendering of summary judgment on the plaintiff's complaint.

## II

Finally, the defendant claims that the court improperly rendered summary judgment in the plaintiff's favor on her counterclaim sounding in breach of contract. Specifically, she argues that the court improperly concluded that the counterclaim (1) failed to allege the formation of a contract, (2) failed to meet the transaction test set forth in Practice Book § 10-10, and (3) was barred by the statute of frauds. We agree with the defendant.

In her counterclaim, the defendant alleged that the plaintiff breached its contract with her when it failed to offer her a permanent loan modification within a reasonable period of time after she made the trial period payments and continued to meet all HAMP program eligibility requirements.[24] The court concluded: "[T]he undisputed facts show that the plaintiff and [the] defendant did not enter into a new contract or agreement," ruling that "[t]he defendant was obligated to make payments on her mortgage as demonstrated by the note, and therefore, the undisputed facts show that the defendant would be obligated to pay the monthly trial plan amount at a minimum. . . . Therefore, the offer of a trial modification, even with a promise of a future alteration to the original mortgage, did not form a new contract." (Citation omitted.) The court further concluded that the purported contract would be unenforceable due to its noncompliance with the statute of frauds, and that the counterclaim, which alleged the failure to execute a loan modification agreement, did not meet the transaction test set forth in Practice Book § 10-10 because it did not satisfy the same transaction standard.

## A

Initially, we discuss whether the court erred in determining that the defendant's counterclaim failed to satisfy the transaction test set forth in Practice Book § 10-10. In its reply to the defendant's objection to the motion for summary judgment, the plaintiff raised the procedural issue that the counterclaim was improper because it did not arise out of the "transaction or one of the transactions which is the subject of the plaintiff's complaint . . . ." Practice Book § 10-10.[25] The defendant claims that the court erred in its application of the transaction test. This is a question of law subject to plenary review. *U.S. Bank National Assn.* v. *Sorrentino,*

supra, 158 Conn. App. 94.

"Although, ordinarily, a challenge to the legal sufficiency of a pleading should be raised by way of a motion to strike; see Practice Book § 10-39 (a); our Supreme Court has held that a motion for summary judgment also may be used to challenge a pleading's legal sufficiency provided that the party seeking summary judgment can establish as a matter of law both that the cause of action alleged is legally insufficient and, more importantly, that any defect in the pleading could not be cured by repleading, which the nonmoving party would have had an opportunity to do if the alleged insufficiency had been raised by way of a motion to strike. See *Larobina* v. *McDonald*, 274 Conn. 394, 401, 876 A.2d 522 (2005) . . . . If both prongs are met, the court may properly grant summary judgment as a matter of law. The court in *Larobina* further explained that we will not reverse the trial court's ruling on a motion for summary judgment that was used to challenge the legal sufficiency of [a pleading] when it is clear that the motion was being used for that purpose and the nonmoving party, by failing to object to the procedure before the trial court, cannot demonstrate prejudice. . . .

"A counterclaim that has been filed in contravention of our rules of practice is legally insufficient. Section 10-10 of the Practice Book provides in relevant part that [i]n any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Sorrentino*, supra, 158 Conn. App. 94–95.

"[A] proper application of Practice Book § 10-10 in a foreclosure context requires consideration of whether a counterclaim has some reasonable nexus to, rather than directly attacks, the making, validity or enforcement of the mortgage or note." (Internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 631–32.[26] Essentially, a counterclaim must have a sufficient relationship to the making, validity or enforcement of the subject note or mortgage in order to meet the transaction test as set forth in Practice Book § 10-10 and the policy consideration it reflects, judicial economy. With respect to that policy consideration, which is one of practicality, the interest of efficiency and judicial economy are served by allowing the complaint and counterclaim to be adjudicated in the same action when the competing claims are closely related. See, e.g., *Jackson* v. *Conland*, 171 Conn. 161, 166, 368 A.2d 3 (1976).

The court, relying on *Sorrentino*, found that the defendant's counterclaim failed to satisfy the transaction test because it did not bear some reasonable nexus

to the making, validity or enforcement of the note. We conclude, however, that the subject counterclaim in the present case sufficiently meets the transaction test of Practice Book § 10-10 because it is intertwined sufficiently with the subject of the foreclosure complaint. The defendant's counterclaim alleges the formation and breach of a contractual agreement, prior to the commencement of this action, intended to lead to an offer from the plaintiff for a permanent modification of the defendant's note and mortgage, which, if accepted, would avoid a foreclosure. In her prayer for relief, the defendant is seeking specific performance of that agreement, or other equitable relief, which is directly and inseparably connected to the relief sought in the plaintiff's complaint because, were the defendant to prevail, the result may be a modification of her obligations under the note and mortgage sought to be enforced in the foreclosure action. "[B]ecause a mortgage foreclosure action is an equitable proceeding, the trial court may consider all relevant circumstances to ensure that complete justice is done." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *M.J. Holdings, LLC*, supra, 143 Conn. App. 326. The connection between the note, the mortgage and the TPP involves the same lender, the same borrower and the same property. Moreover, this interrelationship involves the same constellation of facts underlying the defendant's surviving special defense, and all of these same facts will be part of this case with or without the counterclaim.[27]

Accordingly, the court erred in concluding that the defendant's counterclaim did not satisfy the transaction test.

B

Having concluded that the defendant's counterclaim satisfied the transaction test, we turn to whether the counterclaim was legally sufficient. We address whether there is a genuine issue of material fact as to whether the parties formed a contract. An essential issue for this analysis on which the parties differ is whether, under the HAMP guidelines, the plaintiff was permitted to continue to require additional documentation to verify the defendant's eligibility for a loan modification months after the conclusion of the TPP, or whether the defendant, who made all her trial period payments and remained eligible during the TPP, should have been tendered a permanent modification offer after she successfully completed the trial period. The defendant makes it clear that she is not claiming that the TPP was itself a contract for a permanent loan modification. Rather, a contract governed the terms of the TPP that, if fully performed, required the plaintiff to tender her offer to permanently modify her loan.

The defendant claims that on July 15, 2010, the plaintiff made a definite offer to enter into a contractual relationship that, when accepted by the defendant, cre-

ated a contract binding on both parties.[28] See *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 227, 975 A.2d 1266 (2009); see also 1 Restatement (Second), Contracts § 24 (1981) (offer defined as "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it"). The defendant argues that her acceptance of the contract was evidenced through her performance of the two conditions precedent in the offer: timely payment of all amounts due during the trial period, a fact which is not disputed, and her continued eligibility, a primary source of contention in this case. She maintains that these conditions precedent were solely in her control and did not hinge on the "whims of the plaintiff." She notes that the plaintiff concedes that the terms of the TPP were supplemented by the HAMP guidelines issued by the Treasury Department and that the HAMP guidelines in effect at the time she received the offer from the plaintiff, effective June 1, 2010, namely, HAMP Supplemental Directive 10-01, dated January 28, 2010, required "full verification of borrower eligibility prior to offering a trial period plan." She claims that the record supports her assertion that she submitted extensive income documentation to the plaintiff at its request prior to receiving the TPP offer, and that the plaintiff's underwriting department reviewed her income documentation, verified she was eligible for HAMP and then determined her modified loan terms on July 8, 2010, prior to offering her the July 15, 2010 TPP. She further claims that she submitted more information to the plaintiff at its request during the trial period to verify her continuing eligibility. She maintains that her compliance with these two conditions precedent constituted acceptance of the plaintiff's definite offer, and consideration to induce and bargain for the plaintiff's promise to tender her an offer of a permanent HAMP loan modification, as the acts she promised to perform under the TPP encompassed acts that were not preexisting legal duties. See *Turbeville* v. *JPMorgan Chase Bank*, United States District Court, Docket No. SA CV 10-01464 DOC (JCG), 2011 WL 7163111, *4 (C.D. Cal. April 4, 2011) (plaintiff's submission of TPP financial documents not previously required constituted consideration).

The defendant notes, with regard to further consideration, that any permanent loan modification would have required her to pay interest on a higher principal balance and that the modified loan would have matured with a two month balloon payment that did not previously exist. While she participated in the TPP, her original obligations on the note and mortgage remained unchanged and in effect, and continued to accrue. By delaying in making her full monthly payments, the defendant committed herself to paying a greater amount in the long run because during the months she made reduced payments, interest accrued on a larger sum of

principal than it otherwise would have. Thus, it is unfair to categorize the defendant's promise to pay reduced monthly payments solely as a preexisting duty, as she actually suffered some detriment by agreeing to pay less than the full amount she owed. See *Henderson* v. *Wells Fargo Bank, NA*, United States District Court, Civ. No. 3:13-cv-378 (JBA), 2016 WL 324939, *6 (D. Conn. January 27, 2016) (although plaintiff did have preexisting duty to pay reduced monthly payments, she actually suffered some detriment by agreeing to pay less than full amount owed, committing herself to pay greater amount in long run).

The plaintiff concedes that the defendant made all of her trial period payments on time, but argues that she failed to comply with the second condition precedent in its offer, which is that she continue to meet all HAMP program eligibility requirements, because eventually the plaintiff confirmed, on the basis of updated documents that the defendant sent at its request in May, 2011, six months after the TPP ended, that she no longer qualified. The plaintiff asks this court to reject the defendant's argument that the HAMP guidelines forbid a loan servicer from requesting additional documents to confirm a borrower's continuing eligibility under the program, as HAMP Supplemental Directive 10-01 specifically states that "[b]orrowers who make all trial period payments timely and who satisfy all other trial period requirements will be offered a permanent HAMP modification." Moreover, HAMP guidelines state that when "evaluating a borrower's eligibility for HAMP, servicers should use good business judgment consistent with the judgment employed when modifying mortgage loans held in their own portfolio."

Our review of the HAMP guidelines leads us to conclude that there is a genuine issue of material fact as to whether the plaintiff was permitted to continue to review the defendant's financial eligibility for the HAMP program after the end of her trial period. The plaintiff's own contention, which is that HAMP Supplemental Directive 10-01 specifically states that "[b]orrowers who make all trial period payments timely and who satisfy all other *trial period* requirements will be offered a permanent HAMP modification"; (emphasis added); may be interpreted as indicating that all other requirements have to be met only during the trial period, suggesting an intention not to leave the borrower without notice of a final determination for months afterward, as took place in this case. Although the HAMP handbook may contemplate a prolonged TPP, lasting more than three months, there is no definite indication in the record before us that the plaintiff and the defendant ever agreed to a prolonged TPP.

The plaintiff also claims that the trial court correctly held that the defendant provided no consideration to the plaintiff because she paid less than she already was

obligated to pay under the terms of the existing note and mortgage. "Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Although an exchange of promises usually will satisfy the consideration requirement . . . a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." (Citations omitted; internal quotation marks omitted.) *Christian* v. *Gouldin*, 72 Conn. App. 14, 23, 804 A.2d 865 (2001). "A modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." (Internal quotation marks omitted.) *Thomas* v. *Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 56, 100 A.3d 917 (2014).

In this case, the TPP imposed new obligations on the defendant. The July 15, 2010 letter from the plaintiff that offered the defendant a TPP informed her that in addition to making monthly trial period payments in place of her normal monthly mortgage payments, she had to continue to meet all program eligibility requirements. Attached to this letter was a list of frequently asked questions, which informed the defendant that her credit score may be affected, she may be required to attend credit counseling, that she would be required to have an escrow account for payment of property taxes, insurance premiums and other required charges, and that she was required to provide income and expenses documentation. By not making her full monthly mortgage payments, the plaintiff committed herself to paying a greater amount in the long run, as during the months she made reduced payments, interest accrued on a larger sum of principal than it otherwise would have. In addition, the defendant's account was assessed a charge of $2838.92 when her loan modification was "approved." It is unquestionable that the defendant suffered some detriment additional to any preexisting duties she owed to the plaintiff.

The documents submitted by the defendant and her arguments lead us to conclude that there is a genuine issue of material fact as to whether a contract was formed when she accepted the TPP and complied with its conditions, including remaining financially eligible for the HAMP program throughout the trial time period. There also is a genuine issue of fact as to whether the plaintiff failed to meet its obligations under the TPP, particularly as to the timing of when it made its relevant determinations. Thus, on the existing record, there is a genuine issue as to whether a contract was formed and whether there was a breach by the plaintiff. We therefore conclude that the trial court should not have rendered summary judgment on the counterclaim due to the nonexistence of a contract.

C

We next address whether the contract that the defendant claims was created would be unenforceable under our statute of frauds, § 52-550 (a).[29] The court, after noting that the defendant in her affidavit is alleging an oral agreement, relied on relevant language from *Deutsche Bank Trust Co. Americas* v. *DeGennaro*, 149 Conn. App. 784, 788, 89 A.3d 969 (2014), which held that an oral agreement would be ineffective because "[a] modification of a written agreement [for a loan exceeding $50,000] must be in writing to satisfy the statute of frauds." (Internal quotation marks omitted.)

As the defendant argues, the TPP was not a modification of the note and mortgage, but rather, it was a promise by the plaintiff to tender an offer of a permanent loan modification if the defendant successfully completed the requirements during the three month trial period. Because the TPP was not an agreement for the sale of real property or any interest in or concerning real property, and, arguably was supposed to be performed within one year, and because it was not an agreement for a loan in an amount that exceeded $50,000, it was not a purported contract that falls within the statute of frauds. The TPP is unlike the oral modification agreement that the court in *DeGennaro* found was barred by the statute of frauds, as it is not a modification agreement.

Even if the statute of frauds were applicable to the agreement at issue here, the TPP was in writing, on the letterhead of the plaintiff's mortgage servicer, Chase, included a salutation, stating, "Sincerely, Chase Home Finance, LLC," contained the electronic signature of a Chase representative, and satisfied the evidentiary function of the statute of frauds by providing proof of the contract itself. The defendant further claims that she performed her part of the contract after being induced to do so by the plaintiff. She relies on *Red Buff Rita, Inc.* v. *Moutinho*, 151 Conn. App. 549, 96 A.3d 581 (2014), wherein this court held that "[t]he doctrine of part performance . . . is an exception to the statute of frauds. . . . This doctrine originated to prevent the statute of frauds from becoming an engine of fraud." (Citation omitted; internal quotation marks omitted.) Id., 554–55. In explaining this exception, this court cited *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 873 A.2d 929 (2005), when stating in *Red Buff Rita, Inc.* v. *Moutinho*, supra, 549, that "our Supreme Court clarified and explained the circumstances in which a contract may be enforced despite its noncompliance with the statute of frauds. It also concluded that part performance and equitable estoppel are not separate and independent exceptions to the statute of frauds, but rather, that part performance is an essential element of the estoppel exception to the statute of frauds. . . . [T]he elements required for part performance are: (1) statements, acts

or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract. . . . Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. . . . First, part performance satisfied the evidentiary function of the statute of frauds by providing proof of the contract itself. . . . Second, the inducement of reliance on the oral agreement implicates the equitable principle underlying estoppel because repudiation of the contract by the other party would amount to the perpetration of a fraud." (Citations omitted; internal quotation marks omitted.) Id., 555.

There remain genuine issues of material fact as to (1) whether the statute of frauds would be applicable to the nature of the contract the defendant has alleged, and (2) whether, even if the statute applies, the defendant could prove that the facts in this case entitle her to the application of an exception to it.[30] We therefore conclude that the court erred in rendering summary judgment in favor of the plaintiff on the defendant's counterclaim on the ground that it was legally unenforceable under § 52-550.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion BRIGHT, J., concurred.

[1] The complaint also named as defendants American Fuel Corporation and the town of Cheshire. Neither of these defendants filed an appearance in the trial court or is a party to this appeal. We will refer to Eichten only as the defendant.

[2] For simplicity, the actions of the plaintiff's loan servicer, Chase, will be referred to as the plaintiff's actions. The plaintiff indicated in its brief, and we agree, that "there is no principled reason to draw a distinction between the alleged actions of Chase and/or [the] plaintiff."

[3] As a condition precedent to qualifying for a HAMP loan modification, borrowers are required to make reduced payments on the note and mortgage during a trial period plan.

[4] In her special defenses, the defendant also alleged payment and claimed attorney's fees. In its memorandum of decision, the court addressed the issue of attorney's fees but did not address the issue of payment. The defendant does not raise an issue on appeal regarding the sufficiency of her special defense of payment or her claim for attorney's fees. We therefore consider these claims abandoned. See, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 393–94, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

[5] The record does not reflect how Select Portfolio Servicing, Inc., succeeded Chase as servicer of the loan in question for the plaintiff, but Chase was the servicer at the time the events alleged in the special defenses and counterclaim took place.

[6] The plaintiff, in its complaint, alleges that it was the party entitled to collect the debt evidenced by the note and to enforce the mortgage. Although the defendant denied these allegations in her answer, she did not object to the rendering of summary judgment as to liability or make any claim on appeal that was based on an alleged lack of standing by the plaintiff to bring this foreclosure action.

[7] This letter, which the defendant purports to be the contract between the parties, does not contain any place for a signature by either the plaintiff or the defendant, and it does not contain a time is of the essence clause or any particular date by which a determination on her application for a loan modification would be made.

[8] The defendant alleges that the other person residing in the home was

her fiancé, not her spouse, but does not challenge the propriety of the inclusion of her fiancé's income in calculating monthly gross income for purposes of determining eligibility for the HAMP program.

[9] The housing ratio or monthly mortgage payment ratio, is defined in the HAMP program handbook for servicers submitted by the defendant, as "the ratio of the borrower's current monthly mortgage payment to the monthly gross income of all borrowers on the mortgage note, whether or not those borrowers reside in the property." To qualify for HAMP, verified income documentation must confirm that the borrower's monthly mortgage payment ratio prior to modification is greater than 31 percent.

[10] Internal records of the plaintiff, submitted by the defendant with her objection, reveal that she made six payments of $3373.86 between August, 2010, and January, 2011

[11] The HAMP guidelines provide that "[s]ervicers should include non-borrower household income in monthly gross income if it is voluntarily provided to the borrower and if, in the servicer's business judgment, that income reasonably can continue to be relied upon to support the mortgage payment."

[12] As of July, 2011, the $12,578.85 monthly income of the defendant's fiancé, when combined with her monthly income, was too high a sum for the defendant to qualify for HAMP assistance.

[13] Practice Book § 10-10 provides in relevant part: "In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff . . . provided that each such counterclaim . . . arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint . . . ."

[14] The plaintiff argues on appeal that the court properly granted the motion for summary judgment because the defendant's special defenses do not relate to the making, validity or enforcement of the note and mortgage. Without objection from the defendant, the plaintiff raised this issue at the hearing on the motion for summary judgment and in its reply memorandum of law in support of the motion for summary judgment.

[15] The dissenting opinion in *Blowers* did not agree that a special defense that is based on loan modification negotiations can be viable only if the parties actually reach a modification agreement because it "would unnecessarily shield mortgagees or their agents from judicial scrutiny of potentially unscrupulous behavior that may have directly resulted in the foreclosure action. Courts have not always strictly applied the making, validity, or enforcement requirement in evaluating the sufficiency of equitable special defenses such as those raised here, particularly if a strict application would offend traditional notions of equity." *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 648 (*Prescott, J.*, dissenting).

[16] A fair reading of the HAMP guidelines, Supplemental Directive 09-01, dated April 6, 2009, reveals that, in order to qualify for relief, a borrower must be in default, or, in very limited circumstances, must claim a hardship and be determined to be at imminent risk of default, or "reasonably foreseeable" default. Courts have recognized, however, that servicers are permitted to give priority to borrowers on the basis of their payment or default status. *Lindsay* v. *Bank of America, N.A.*, United States District Court, Civ. No. 12-00277 LEK-BMK, 2012 WL 5198160, *12 (D. Haw. October 19, 2012).

[17] In her special defense of breach of contract, the defendant does not allege, as she does in her counterclaim, that she was promised a permanent loan modification if she made all trial payments on a timely basis *and* continued to meet all program eligibility requirements.

[18] The fact that the defendant avers in her affidavit that she continued to comply with all guidelines during the trial period does not cure the pleading deficiency in her special defense, as the allegations necessarily frame the party's claim.

[19] Actually, such financial incentives would have been paid to the servicer, not directly to the plaintiff, and only would have been paid if and when the loan was modified.

[20] The defendant also argues that the court erred in determining, on the basis of the language in the note and mortgage, that there was no genuine issue of material fact as to whether the defendant was aware of the consequences of default. She contends that a reasonable fact finder could determine that the defendant was unaware that the plaintiff would treat her loan as delinquent, given that the plaintiff instructed her to default, the program did not exist at the time of the execution of the note and mortgage, the defendant may not have understood the intricacies of her mortgage contract and was relying on the plaintiff's superior knowledge, and the note and mortgage do not discuss adverse credit reporting. For the reasons set for

previously, we are unpersuaded.

[21] To the extent that the defendant is attempting to claim in her second special defense that the plaintiff violated the covenant of good faith and fair dealing pursuant to a purported agreement to provide her with an offer for a permanent loan modification, she cannot prevail because she fails to allege the formation of such a contract in this special defense.

[22] We note that promissory estoppel is usually pleaded as a cause of action as an alternative to a breach of contract claim. "Promissory estoppel is asserted when there is an absence of consideration to support a contract. . . . [T]he doctrine of promissory estoppel serves as an alternative basis to enforce a contract in the absence of competing common-law considerations . . . ." (Citation omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 88–89, 873 A.2d 929 (2005)." Although the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because [t]he prerequisite for . . . application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an offer." (Emphasis in original; internal quotation marks omitted.) *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 105, 837 A.2d 736 (2003).

[23] The defendant does not dispute that by May, 2011, when she provided the plaintiff with additional requested documentation she no longer qualified under the program.

[24] We note that the counterclaim, unlike the defendant's breach of contract and promissory estoppel special defenses, sufficiently alleges that she fully performed her part of the bargain pursuant to the alleged contract.

[25] See footnote 21 of this opinion regarding the defendant's claim that the court improperly addressed this issue because it was first raised by the plaintiff in its memorandum of law in reply to the defendant's objection to the motion for summary judgment.

[26] In *Blowers*, this court determined that counterclaims arising from factual allegations pertaining to the mortgagee's "conduct during postdefault mediation and loan modification negotiations" did not relate to the making, validity or enforcement of the note, and, thus, failed the transaction test. *U.S. Bank National Assn.* v. *Blowers*, supra, 177 Conn. App. 632. The present case is factually distinguishable because the defendant claims that the plaintiff was required to offer her a modification under the terms of their TPP agreement. Cf. id., 630.

[27] We also note that we have concluded in part I of this opinion that the defendant's special defense of unclean hands meets the making, validity or enforcement test.

[28] "Whether the TPP is an enforceable contract for a loan modification has been the subject of extensive litigation [in federal circuit courts] . . . with courts reaching mixed results. The [United States Court of Appeals for the] Second Circuit has not weighed in on the issue, but the First, Ninth, and Seventh Circuits have held that the TPP is an enforceable contract. See *Corvello* [v. *Wells Fargo Bank, N.A.*, 728 F.3d 878, 885 (9th Cir. 2013)]; *Young* v. *Wells Fargo Bank, N.A.*, 717 F.3d 224, 235 (1st Cir. 2013); *Wigod* [v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012)]. Those courts reasoned that the most natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain. . . . [T]here could be no actual mortgage modification until all the requirements were met, but the servicer could not unilaterally and without justification refuse to send the offer." (Internal quotation marks omitted.) *Henderson* v. *Wells Fargo Bank, NA*, United States District Court, Civ. No. 3:13-cv-378 (JBA), 2016 WL 324939, *4 n.5 (D. Conn. January 27, 2016); see also *Markey* v. *Ditech Financial LLC*, United States District Court, Docket No. 3:15-cv-1711 (MPS), 2016 WL 5339572, *3 (D. Conn. September 22, 2016).

[29] General Statutes § 52-550 provides in relevant part: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars . . . ."

[30] See *Everbank* v. *Engelhard*, Superior Court, judicial district of Waterbury, Docket No. CV-13-6019881, 2016 WL 4507450, *2 (July 28, 2016) (late payments accepted by lender under TPP constituted part performance, preventing application of statute of frauds); *Corvello* v. *Wells Fargo Bank, N.A.*, 728 F.3d 878, 885 (9th Cir. 2013) (finding part performance exception to statute of frauds under California law applicable to HAMP TPP because borrowers fully performed under TPP).