******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# M&T BANK *v.* ROBERT R. LEWIS
## (SC 20817)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The plaintiff bank sought to foreclose on a mortgage on certain real property owned by the defendant after he defaulted on a promissory note secured by the mortgage. The mortgage agreement included a provision authorizing the plaintiff to purchase force placed insurance coverage for the property if the defendant failed to maintain adequate coverage. The defendant filed an answer and a counterclaim, and asserted various special defenses, including unclean hands and breach of the implied covenant of good faith and fair dealing, which were predicated on allegations relating to the plaintiff's purchase of force placed flood insurance from A Co., an insurance provider. The defendant did not challenge the plaintiff's right to purchase the force placed insurance but alleged that the plaintiff was involved in an undisclosed kickback scheme with A Co., pursuant to which the plaintiff used A Co. as its exclusive force placed insurance provider, and, in exchange, A Co. provided the plaintiff with certain rebates, including free or below cost mortgage services. The defendant claimed that, instead of passing those rebates on to him, the plaintiff charged him more than the cost of purchasing the force placed coverage, contrary to both the provisions of the mortgage agreement and certain representations the plaintiff had made to him. The defendant's answer also included numerous allegations concerning the plaintiff's nationwide kickback scheme with A Co. and its impact on borrowers generally. The plaintiff filed a motion to strike the special defenses and the counterclaim, which the trial court granted in part. In connection with its decision to strike the special defenses of unclean hands and breach of the implied covenant of good faith and fair dealing, the trial court reasoned that the allegations concerning the kickback scheme were broad and related to borrowers generally instead of to the defendant specifically, and, therefore, the allegations did not arise from the making, validity, or enforcement of the specific mortgage at issue. The trial court subsequently granted the plaintiff's motion for summary judgment as to liability and rendered judgment of foreclosure by sale, from which the defendant appealed. Thereafter, the plaintiff moved to dismiss the appeal, claiming that the regulatory approval of the premium rate for the flood insurance at issue rendered the defendant's special defenses moot under the federal filed rate doctrine, pursuant to which any rate that is approved by the governing regulatory agency is per se reasonable and unassailable in judicial proceedings brought by ratepayers. *Held*:

1. The filed rate doctrine, as applied by the federal courts, did not implicate this court's subject matter jurisdiction, and, accordingly, this court denied the plaintiff's motion to dismiss the appeal:

Although one of the rationales for the filed rate doctrine, namely, that courts should not undermine agency rate-making authority by upsetting approved insurance rates, is connected to the principle of nonjusticiability, the fact that that term sounds jurisdictional did not necessarily render the filed rate doctrine a jurisdictional one, and the nonjusticiability rationale simply reflects the deference owed to agency expertise and the reluctance of courts to second-guess such determinations.

Moreover, nothing inherent in the nonjusticiability rationale for the filed rate doctrine implicates the principles underlying the mootness doctrine, there was no support in the case law for the proposition that the application of the filed rate doctrine renders an action moot, and this court agreed with the majority of federal courts that have concluded that the filed rate doctrine does not implicate subject matter jurisdiction but, rather, constitutes a defense on the merits that relates to whether a party has failed to state a legally cognizable claim.

To the extent that the plaintiff argued that the present appeal had been rendered moot because the defendant could not prevail as a matter of law in light of certain federal court judgments dismissing actions brought by the defendant against the plaintiff and A Co., among other parties, on the basis of the filed rate doctrine, that argument related to the merits of the present appeal and not to this court's jurisdiction, and this court's acceptance of the plaintiff's argument would invite parties to interject mootness claims whenever there is a basis to challenge the legal sufficiency of a claim or defense.

In view of its determination that the filed rate doctrine does not implicate subject matter jurisdiction, this court did not need to determine whether to adopt that doctrine as a matter of state law.

2. The trial court improperly struck the defendant's special defenses of unclean hands and breach of the implied covenant of good faith and fair dealing, and, accordingly, this court reversed the trial court's judgment and remanded the case for further proceedings:

To survive a motion to strike, a special defense to a foreclosure action must relate to the making, validity or enforcement of the note or the mortgage and otherwise be legally sufficient.

Contrary to the trial court's conclusion, the defendant's answer included allegations that related to his specific mortgage, and the broader allegations therein relating to the plaintiff's global conduct and borrowers generally were necessary to provide context for the allegations that were specific to the defendant's mortgage.

Specifically, the defendant alleged that, pursuant to the mortgage agreement, the plaintiff purchased from A Co. force placed insurance for his property, the plaintiff failed to disclose that it had a financial arrangement with A Co. in exchange for an exclusive relationship, the plaintiff represented to the defendant that it would charge him only for the cost of the insurance but did not pass on to the defendant the rebates it received from A Co., resulting in the defendant being charged more than the cost of the force placed insurance, the plaintiff's representations to the defendant were false and made to induce him to act to his detriment, which he did, and the plaintiff's false representations undermined the validity of the mortgage.

Moreover, those allegations were sufficiently related to the making, validity or enforcement of the mortgage, insofar as the plaintiff's alleged conduct involving the alleged kickback scheme was directly related to its enforcement of the provision of the mortgage agreement authorizing the plaintiff to purchase force placed insurance, and the alleged effect of the plaintiff's conduct in enforcing that provision, that it wrongfully increased the defendant's overall debt, provided a sufficient nexus to the foreclosure action.

Furthermore, this court has defined the term "enforcement" to encompass a mortgagee's conduct during postdefault loan modification negotiations if the alleged misconduct substantially increases the overall debt or impedes a mortgagor from curing the default, and, construing the allegations in the present case in the manner most favorable to sustaining their legal sufficiency, this court concluded that the defendant sufficiently alleged that the plaintiff's misconduct in carrying out the kickback scheme increased the defendant's overall debt beyond that which was necessary to protect the plaintiff's interest in the property.

In addition, the defendant's answer also alleged that the plaintiff's conduct related to the validity of the mortgage, as it could be inferred from the defendant's answer that he was claiming that, because the plaintiff entered into the mortgage agreement with the kickback scheme in place and made certain representations to the defendant that he would be charged only for the cost of the force placed insurance, the mortgage agreement was invalid.

There was no merit to the plaintiff's claim that the defendant's breach of the underlying loan contract barred him from relying on the unclean hands doctrine, as a mortgagor who has defaulted on a mortgage is not precluded from asserting the special defense of unclean hands, and the defendant sufficiently alleged that the plaintiff had engaged in wilful conduct that was not equitable, fair or honest.

The special defense of breach of the implied covenant of good faith and fair dealing was otherwise legally sufficient, insofar as the defendant properly pleaded that the plaintiff's alleged misrepresentations and kick-

back scheme caused him to pay more than he was obligated to pay and more than the plaintiff was entitled to charge, thus interfering with his right to receive the benefits of the mortgage agreement by increasing his overall debt.

Argued November 14, 2023—officially released April 30, 2024

*Procedural History*

Action to foreclose a mortgage on certain of the defendant's real property, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendant filed an answer, special defenses and a counterclaim; thereafter, the court, *Hon. Anthony V. Avallone*, judge trial referee, granted in part the plaintiff's motion to strike the defendant's special defenses and counterclaim; subsequently, the court, *Cirello, J.*, granted the plaintiff's motion for summary judgment as to liability only; thereafter, the court, *Spader, J.*, rendered judgment of foreclosure by sale, and the defendant appealed. *Reversed*; *further proceedings*.

*Alex Emmons* and *Kyle Ranieri*, law student interns, with whom were *Jeffrey Gentes* and, on the brief, *Anika Singh Lemar*, and *Callan Bruzzone, Leah Kazar, Miriam Pierson, Natasha Reifenberg* and *Zachary Shelley*, law student interns, for the appellant (defendant).

*Geoffrey K. Milne*, for the appellee (plaintiff).

*Opinion*

ROBINSON, C. J. This foreclosure appeal presents two questions, namely, (1) whether the administrative law filed rate doctrine implicates the trial court's subject matter jurisdiction, and (2) whether allegations of impropriety in a mortgagee's force placement of property insurance arise from the making, validity or enforcement of the mortgage for purposes of a special defense to a foreclosure action. The defendant, Robert R. Lewis,

appeals[1] from the judgment of foreclosure by sale in favor of the plaintiff, M&T Bank. The defendant claims that the trial court improperly granted the plaintiff's motion to strike two of the defendant's special defenses arising from the plaintiff's conduct in its force place-ment of flood insurance on the property at issue, alleg-ing that the plaintiff has unclean hands and breached the implied covenant of good faith and fair dealing on the ground that those defenses do not arise from the making, validity or enforcement of the mortgage. The plaintiff contends to the contrary, and also argues that the regulatory approval of the premium rate for the prop-erty insurance at issue renders the defendant's special defenses moot under the filed rate doctrine. Having concluded that the filed rate doctrine does not implicate the court's subject matter jurisdiction, we agree with the defendant's claims with respect to his special defenses. Accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed relevant facts and procedural background. On July 26, 2010, the defendant executed a promissory note to Hudson City Savings Bank (Hudson) in exchange for a loan in the original principal amount of $384,000. The note was secured by a mortgage on the defendant's real property in Branford. Hudson subsequently merged with and into the plaintiff, which then became the holder of the note. Prior to the defendant's default, when he failed to pay his property taxes, the plaintiff paid them in full and thereafter increased the defendant's monthly payment from $3011 to $9640. After the defendant failed to make his monthly payment on August 1, 2017, the plaintiff notified him in writing of his default. The plaintiff subse-quently elected to accelerate the note and foreclose on the mortgage. The parties participated in the state's

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and this court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

court-supervised foreclosure mediation program but were unable to reach an agreement to modify the loan. See General Statutes §§ 49-31k through 49-31*o*.

The defendant filed an answer to the complaint, a two count counterclaim, and five special defenses, namely, fraud, breach of the implied covenant of good faith and fair dealing, unconscionability, unclean hands, and equitable estoppel. With the exception of the special defense of equitable estoppel, the defenses were predicated on allegations relating to the plaintiff's purchase, pursuant to the mortgage agreement, of force placed insurance coverage[2] after the defendant allowed the flood insurance policy on the property to lapse sometime in 2017. The defendant conceded that the plaintiff was entitled, pursuant to the mortgage agreement, to purchase force placed flood insurance for the property. In his special defenses, however, the defendant alleged that, in the course of exercising its right under the mortgage agreement to purchase force placed insurance, the plaintiff charged him more than the "cost" of that insurance. Specifically, the defendant alleged that the plaintiff has an exclusive arrangement with Assurant, Inc. (Assurant), of which the provider in the present case, American Security Insurance Company (ASIC), is an indirect subsidiary. In exchange for the right to be the sole provider of the plaintiff's force placed insurance coverage, ASIC allegedly provides what the defendant characterizes as "kickbacks" to the plaintiff. The defendant alleged that these kickbacks included free or below cost mortgage services, reimbursement for incurred expenses, and the payment of reinsurance premiums. These various practices, the defendant claimed, amounted to "rebate[s]" received by the plaintiff from

---

[2] "An insurance policy purchased by a lender upon the lapse of a borrower's insurance policy is called a [force placed] insurance policy." (Internal quotation marks omitted.) *Miller* v. *Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 548 (S.D.N.Y. 2014).

ASIC with respect to the price of the insurance. The plaintiff does not deduct the value of these alleged kickbacks from the amount it charges borrowers and, instead, charges them the "pre-rebate" amount for the force placed insurance coverage. The defendant alleged that, through this practice, the plaintiff charged the defendant more than the "cost" of the force placed insurance coverage, contrary to both the provisions of the mortgage agreement and the plaintiff's representations—in letters notifying the defendant of its intent to force place insurance coverage if the defendant failed to cure the lapse in coverage—that it would charge him only for the cost of force placed insurance.

With respect to the defendant's special defense of equitable estoppel, in addition to relying on the allegations regarding force placed insurance, the defendant also alleged that, prior to defaulting on the note, he contacted the plaintiff seeking to discuss a modification of the agreement that would extend the term of the loan at the same interest rate. The plaintiff informed the defendant that it could not discuss a modification of the loan unless the mortgage was in default. The defendant further alleged that, in reliance on that representation by the plaintiff, he defaulted and began to seek a modification of the loan. The defendant also conceded, however, that he had defaulted because he was unable to make his monthly payment of $9640. The defendant contended that the plaintiff's representation to him that it could not discuss a modification prior to default was false, that the plaintiff reasonably would have expected the defendant to rely on that alleged misrepresentation, and that he did so to his detriment.

The trial court, *Hon. Anthony V. Avallone*, judge trial referee, granted the plaintiff's motion to strike all but the special defense of equitable estoppel, insofar as that defense rested on allegations that the plaintiff had made misrepresentations regarding a modification to the defen-

dant's mortgage agreement. In granting the motion to strike as to the remaining defenses and the counterclaim, the court focused on the paragraphs in the defendant's answer alleging that the plaintiff's "kickback" scheme was a broad one, targeting "borrowers," not merely the defendant. The court reasoned that these broad allegations, relating to what it termed the plaintiff's "global purchase of insurance," had "little or nothing to do with this specific case of the defendant's own failure to maintain insurance." Therefore, the court concluded, the defendant's allegations did "not arise from the making, validity or enforcement of the *specific* mortgage at issue in this case." (Emphasis added.) The court's memorandum of decision did not discuss the defendant's more specific allegations, namely, that the plaintiff had received "kickbacks" from ASIC in connection with the force placed insurance coverage provided for the defendant's property.

The trial court, *Cirello, J.*, subsequently granted the plaintiff's motion for summary judgment as to liability only.[3] Following the trial court's denial of the defendant's motion to reargue and reconsider its decision

[3] In granting the plaintiff's motion for summary judgment, the trial court rejected the defendant's special defense of equitable estoppel, concluding that he had failed to present any evidence that there existed a genuine issue of material fact regarding whether the plaintiff made a false representation when it informed him that it could not discuss a loan modification unless he was in default. In rejecting the defendant's contention that the plaintiff had made a misrepresentation to him, the court reasoned that the plaintiff did not promise the defendant a loan modification if he defaulted. Instead, the court found that the plaintiff had informed the defendant that it would *discuss* a loan modification only in the event of a default. The court observed that the foreclosure mediation reports indicated that the plaintiff had negotiated with the defendant in good faith. Finally, relying on the defendant's concession that he was unable to pay the monthly payments, the court concluded that the defendant failed to present sufficient evidence that he had changed his position or otherwise acted to his detriment in a manner that he would not have done but for the plaintiff's statement. The defendant defaulted, the trial court concluded, because he was unable to make the payments, not because he relied on the plaintiff's statement.

granting the plaintiff's motion for summary judgment, the court, *Spader, J.*, rendered a judgment of foreclosure by sale. This appeal followed.

I

As a preliminary matter, we address the plaintiff's motion to dismiss this appeal as moot, which the plaintiff filed shortly before oral argument in the present case. The plaintiff contends that federal court decisions that had dismissed two separate actions brought by the defendant—one against the plaintiff and ASIC; see *Lewis* v. *M&T Bank*, Docket No. 21-933, 2022 WL 775758 (2d Cir. March 15, 2022); and a second against Assurant and ASIC; see *Lewis* v. *Assurant, Inc.*, Docket No. 3:21-cv-01539 (VAB), 2022 WL 4599038 (D. Conn. September 30, 2022) (second federal action)—render this appeal moot.[4] Although both federal actions were dismissed pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief could be granted, the plaintiff contends that the theory pursuant to which those actions were dismissed, the filed rate doctrine, implicates our subject matter jurisdiction. We disagree and conclude that the filed rate doctrine, as applied by the federal courts, does not affect our subject matter jurisdiction over this appeal.[5]

The record reveals the following additional procedural background relevant to the plaintiff's motion to dismiss this appeal. On April 24, 2020, while the present case was pending before the trial court, the defendant

---

[4] We note that the plaintiff requested that this court take judicial notice of the federal decisions. We may consider the federal decisions without the need to rely on the doctrine of judicial notice. It is axiomatic that courts routinely consider authority from other jurisdictions without relying on judicial notice.

[5] We observe that this court has not yet had occasion to determine whether to adopt the filed rate doctrine as a matter of state law. Because we conclude that the doctrine does not implicate subject matter jurisdiction, we do not reach the merits of its application in this appeal.

filed a complaint against the plaintiff and various subsidiaries of Assurant, including ASIC, in the United States District Court for the District of Connecticut, alleging fraud and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. See *Lewis* v. *M&T Bank,* Docket No. 3:20-CV-00552 (JCH), 2021 WL 1056827, *1, *3 (D. Conn. March 19, 2021) (first federal action). As to the plaintiff only, the defendant also alleged in the first federal action breach of the implied covenant of good faith and fair dealing, breach of contract, unjust enrichment, and a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. Id. The defendant's complaint was predicated on the same theory on which he relies in support of his special defenses in the present case—that the plaintiff received kickbacks from its insurance providers in exchange for using them exclusively for its force placed insurance coverage, and that it retained the kickbacks rather than passing them on to the defendant, as required by the mortgage agreement and subsequent notices provided to the defendant. Id.

The plaintiff, as the defendant in the first federal action, moved to dismiss the complaint pursuant to rule 12 (b) (6) of the Federal Rules of Civil Procedure. Id., *1. The plaintiff contended that the first federal action was barred by the "filed rate doctrine," pursuant to which "any filed rate—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." (Internal quotation marks omitted.) Id., *5. Finding that ASIC had the applicable, approved rates on file with the Connecticut Insurance Department when it issued the force placed insurance purchased by the plaintiff on the defendant's behalf, the court agreed and granted the plaintiff's motion to dismiss the complaint. Id., *6–8. On appeal, the Second Circuit affirmed the

judgment of the District Court. *Lewis* v. *M&T Bank*, supra, 2022 WL 775758, *3.

In the second federal action the defendant subsequently brought against Assurant and ASIC, he again relied on the alleged force placed insurance kickback scheme. Relying on the judgment in the first federal action, the District Court concluded that the doctrine of claim preclusion barred the second federal action.[6] *Lewis* v. *Assurant, Inc.*, supra, 2022 WL 4599038, *7–8, *10.

Although the plaintiff raises its reliance on the federal actions and the filed rate doctrine for the first time on appeal, we nevertheless address this claim insofar as it is well established "that the question of subject matter jurisdiction, because it addresses the basic competency of the court, can be raised by any of the parties, or by the court sua sponte, *at any time* . . . ." (Emphasis added; internal quotation marks omitted.) *Peters* v. *Dept. of Social Services*, 273 Conn. 434, 441–42, 870 A.2d 448 (2005). Therefore, because the plaintiff's motion to dismiss alleges an issue of subject matter jurisdiction, before proceeding to the merits of the appeal, we first must resolve whether we have jurisdiction. See, e.g.,

---

[6] At oral argument before this court, the plaintiff's counsel also suggested that the federal judgments bar the special defenses in the present action pursuant to either the doctrine of collateral estoppel or res judicata. Although those doctrines, if applicable, would prevent the defendant from relitigating any barred claims, they do not implicate subject matter jurisdiction, as the plaintiff's counsel conceded during oral argument. Unlike claims implicating subject matter jurisdiction, which may be raised at any time; see, e.g., *Bank of New York Mellon* v. *Tope*, 345 Conn. 662, 677 n.6, 286 A.3d 891 (2022); a claim that an action or claim is barred by res judicata or collateral estoppel must be raised in the trial court through appropriate pleadings. See, e.g., *Labbe* v. *Pension Commission*, 229 Conn. 801, 816, 643 A.2d 1268 (1994) ("[r]es judicata does not provide the basis for a judgment of dismissal; it is a special defense that is considered after any jurisdictional thresholds are passed"); see also Practice Book § 10-50 (res judicata is special defense that "must be specially pleaded"). Accordingly, we offer no opinion as to whether the defendant's special defenses would be barred by a properly pleaded claim of either res judicata or collateral estoppel.

*Bank of New York Mellon* v. *Tope*, 345 Conn. 662, 676–77 and n.6, 286 A.3d 891 (2022) (addressing question of subject matter jurisdiction raised for first time on appeal).

We begin with the principles underlying the mootness doctrine. "It is a [well settled] general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Bornemann* v. *Connecticut Siting Council*, 287 Conn. 177, 181–82, 947 A.2d 302 (2008).

The plaintiff's jurisdictional claim relies on the filed rate doctrine, under which "any filed rate—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers. . . . The doctrine is grounded on two rationales: first, that courts should not [undermine] agency rate-making authority by upsetting approved rates (the principle of nonjusticiability); and, second, that litigation should not become a means for certain ratepayers to obtain preferential rates (the principle of nondiscrimination)." (Citation omitted; internal quotation marks omitted.) *Rothstein* v. *Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015).

Although the term "justiciability" is one that ordinarily is associated with subject matter jurisdiction, the mere fact that the term "nonjusticiability," as used in the filed rate doctrine case law, *sounds* jurisdictional does not necessarily render that doctrine a jurisdic-

tional one. Some federal courts, in fact, have explained that the nonjusticiability rationale underlying the doctrine simply reflects the deference owed to agency expertise and the reluctance of courts to second-guess such determinations. See, e.g., *Haskins* v. *First American Title Ins. Co.*, 866 F. Supp. 2d 343, 353 (D.N.J. 2012); *In re Pennsylvania Title Ins. Antitrust Litigation*, 648 F. Supp. 2d 663, 683 (E.D. Pa. 2009).

Second, nothing inherent in the nonjusticiability rationale for the filed rate doctrine implicates the principles underlying the mootness doctrine. Our research has not uncovered any instances in which a court has concluded that the filed rate doctrine somehow renders an action moot. Mootness aside, we acknowledge that at least one federal court has concluded that, because the doctrine renders a filed rate unassailable as a matter of law, it has the jurisdictional effect of depriving plaintiffs of *standing* to challenge a filed rate. In *Morales* v. *Attorneys' Title Ins. Fund, Inc.*, 983 F. Supp. 1418, 1429 (S.D. Fla 1997), a federal District Court in Florida concluded that the plaintiffs lacked standing to bring a claim challenging a filed rate pursuant to the federal Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 et seq. (RESPA). The court in *Morales* reasoned that, as long as the rate charged by the mortgagee or mortgage servicer does not exceed the filed rate, plaintiffs bringing such claims have failed to allege an injury in fact under RESPA because "they have no legal right to pay anything other than the promulgated rates . . . ." Id. Therefore, the court concluded, the filed rate doctrine deprives such plaintiffs of standing, thus depriving the courts of jurisdiction. See id.

*Morales* is an outlier. The overwhelming majority of courts that have considered the issue, including the courts in the Second Circuit, have rejected this reasoning and concluded that the filed rate doctrine does not implicate subject matter jurisdiction and, instead,

constitutes a defense on the merits. See, e.g., *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 220–21 (S.D.N.Y. 2016); *Hoover* v. *HSBC Mortgage Corp. (USA)*, 9 F. Supp. 3d 223, 237 (N.D.N.Y. 2014). We find especially persuasive the reasoning of the United States District Court for the Southern District of New York in its decision in *Curtis* v. *Cenlar FSB*, Docket No. 13 Civ. 3007 (DLC), 2013 WL 5995582 (S.D.N.Y. November 12, 2013). In *Curtis*, the court rejected an argument that echoed the rationale relied on by the court in *Morales*, namely, that, because plaintiffs who challenge a filed rate will lose on the merits, they cannot show that they have suffered a cognizable injury, and, therefore, the filed rate doctrine deprives them of standing. See id., *2. The flaw in this reasoning, the court explained, is that it would "allow any [r]ule 12 (b) (6) motion to be restyled as a [r]ule 12 (b) (1) standing motion. [Although] standing and merits questions frequently overlap, standing is fundamentally about the propriety of the *individual* litigating a claim irrespective of its legal merits, [whereas] a [r]ule 12 (b) (6) inquiry is concerned with the legal merits of the claim itself. . . . [In *Curtis*], the defendants [were] not contending that [the plaintiff was] the wrong individual to bring these legal claims; they [were] arguing that the claims [were] simply not legally cognizable." (Citation omitted; emphasis in original.) Id.

We agree with the majority of courts that have concluded that the filed rate doctrine does not implicate standing and, instead, relates to whether a party has failed to state a legally cognizable claim. Accordingly, even if this court were to adopt the filed rate doctrine as a matter of state law, the doctrine would not implicate subject matter jurisdiction. Indeed, the plaintiff's argument that the filed rate doctrine renders this appeal moot suffers from the same flaw as the rationale in support of the position that the filed rate doctrine impli-

cates standing.[7] To the extent that the plaintiff argues that the present case is rendered moot because the defendant cannot prevail as a matter of law given the judgments of the federal courts, which relied on the filed rate doctrine to dismiss the defendant's claims pursuant to rule 12 (b) (6); see *Lewis* v. *M&T Bank*, supra, 2022 WL 775758, *1, *3; this argument relates to the merits of the appeal, and not our jurisdiction. As the Appellate Court aptly stated in a recent case, "[e]ven the most compelling legal or factual argument that a particular claim or cause of action will fail on its merits will not support a conclusion that the asserted claim or cause of action is moot. This is because the proper inquiry with regard to mootness is not whether some change in circumstances has occurred after the claim or cause of action is asserted that forecloses any chance of success on the merits but, rather, whether that change would prevent the court from granting any and all practical relief *even assuming that the proponent is able to prevail on the merits, no matter how unlikely.*" (Emphasis in original.) *307 White Street Realty, LLC* v. *Beaver Brook Group, LLC*, 216 Conn. App. 750, 768, 286 A.3d 467 (2022); see *State* v. *McElveen*, 261 Conn. 198, 205, 802 A.2d 74 (2002) ("[A] case does not necessarily become moot by virtue of the fact that . . . due

---

[7] During oral argument before this court, the plaintiff's counsel made the conclusory assertion that the filed rate doctrine also renders the defendant's special defenses unripe for judicial review. Our review of decisions discussing the filed rate doctrine has failed to reveal any decision holding that the filed rate doctrine, without more, implicates the ripeness doctrine. We observe that the plaintiff has not claimed that the Connecticut Insurance Department's decision regarding the filed rate is still pending, or in any other manner lacks finality, thus rendering the issues in this appeal unripe. See, e.g., *Francis* v. *Board of Pardons & Paroles*, 338 Conn. 347, 359, 258 A.3d 71 (2021) ("in determining whether a case is ripe, a . . . court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent [on] some event that has not and indeed may never transpire" (internal quotation marks omitted)). That claim would seem, in fact, to be counter to the plaintiff's reliance on the alleged filed rate with the Connecticut Insurance Department.

to a change in circumstances, relief from the actual injury is unavailable. . . . [A] controversy continues to exist, affording the court jurisdiction, if the actual injury suffered by the litigant potentially gives rise to a collateral injury from which the court can grant relief."); see also *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 27–28, 287 A.3d 557 (2023) ("[w]hen, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot" (internal quotation marks omitted)). Put differently, agreeing with the plaintiff's argument would invite parties to interject mootness claims whenever there exists a basis to challenge the legal sufficiency of a claim or defense. Because a live controversy remains between the parties in state court, notwithstanding the decisions of the federal courts in the related cases, this appeal is not moot. See, e.g., *CT Freedom Alliance, LLC* v. *Dept. of Education*, supra, 27–28. Accordingly, we deny the plaintiff's motion to dismiss this appeal.

## II

We next turn to the defendant's claim that the trial court improperly granted in part the plaintiff's motion to strike the defendant's special defenses of unclean hands and breach of the implied covenant of good faith and fair dealing on the basis that those defenses, predicated on the plaintiff's improprieties in the force placement of the flood insurance, do not "arise from the making, validity or enforcement" of the mortgage. Quoting *U.S. Bank National Assn.* v. *Blowers*, 332 Conn. 656, 675, 212 A.3d 226 (2019), the defendant contends that the special defenses are "directly and inseparably connected . . . to [the] enforcement of the note and mortgage" and are otherwise legally sufficient. (Internal quotation marks omitted.) In response, the plaintiff argues that the trial court properly struck the special defenses because (1) the special defenses were not

related to the making, validity or enforcement of the mortgage, (2) the defendant's breach of the underlying loan contract bars him from relying on the doctrine of unclean hands, and (3) the defendant failed to plead a valid special defense sounding in breach of the implied covenant of good faith and fair dealing because he did not assert any causal connection between the plaintiff's allegedly bad acts and his default under the terms of the note and mortgage.[8] We agree with the defendant and conclude that the trial court improperly struck the special defenses.

Our review of the trial court's decision to grant the plaintiff's motion to strike is plenary. See, e.g., id., 667. "[A] motion to strike challenges the legal sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court . . . . In ruling on a motion to strike, the court must accept as true the facts alleged in the special defenses and construe them in the manner most favorable to sustaining their legal sufficiency. . . . The allegations of the pleading involved are entitled to the same favorable construction a trier would be required to give in admitting evidence under them and if the facts provable under its allegations would support

---

[8] The plaintiff contends that the defendant "abandoned" his special defenses of unclean hands and breach of the implied covenant of good faith and fair dealing by failing to move for reargument, to seek an articulation or to replead the special defenses. Without pointing to any deficiencies in the record, the plaintiff claims that the defendant's failure to pursue these courses of action has somehow rendered the record inadequate for review. We disagree and conclude that the record is adequate for review. To the extent that the plaintiff's argument could be understood to assert that the defendant's claims are unpreserved, we also disagree. The plaintiff has cited no authority as support for the general proposition that the failure to replead, to seek an articulation or to move for reargument by necessity requires the conclusion that an otherwise properly raised claim is unpreserved, and the plaintiff did not claim that any specific procedural facts of the present case required that conclusion. In fact, during oral argument, the plaintiff's counsel conceded that the failure to replead does not preclude appellate review of a grant of a motion to strike.

a defense or a cause of action, the motion to strike must fail." (Citations omitted; internal quotation marks omitted.) Id., 668.

To survive a motion to strike, a special defense to a foreclosure action must relate to the making, validity or enforcement of the note or mortgage and otherwise be legally sufficient. Id., 670; see id., 675 (defining scope of "enforcement" in "making, validity or enforcement" test and acknowledging that defenses must "otherwise be legally sufficient"). In the present case, the trial court struck the special defenses of unclean hands and breach of the implied covenant of good faith and fair dealing on the ground that the defendant's allegations did not relate to "the *specific* mortgage at issue in this case." (Emphasis added.) The court pointed to the defendant's allegations of the plaintiff's "global" conduct relating to an alleged nationwide kickback scheme. For example, the answer alleges that the plaintiff, ASIC and other subsidiaries of Assurant have an "agreement" whereby, in exchange for the plaintiff's utilization solely of Assurant subsidiaries, including ASIC, to provide force placed insurance, Assurant and its subsidiaries pay the plaintiff "gratuitous kickbacks that are mischaracterized to *borrowers* as legitimate compensation." (Emphasis added.) Similarly, the answer also alleges that, "[d]espite representations to *borrowers* that they will . . . be charged [only] for the cost of insurance coverage, and provisions in the mortgage contracts binding them to do so, [the plaintiff] charges *borrowers* the cost of coverage plus the amount of the kickbacks; it does not, that is, pass these rebates on to the *borrower*." (Emphasis added.) Indeed, twenty-seven paragraphs of the answer are devoted solely to laying out these general allegations, none of which pertains directly to the defendant's mortgage. The trial court correctly observed that "[t]he broad scope of the plaintiff's dealings with insurance companies to protect premises whose owners fail to

obtain insurance has little or nothing to do with this specific case of *the defendant's own failure* to maintain insurance." (Emphasis added.)

The defendant contends persuasively, however, that these general allegations were necessary to provide context for the allegations specific to his mortgage. For example, the answer also alleges that (1) through ASIC, the plaintiff force placed insurance coverage on the defendant's property in 2017 and 2018, pursuant to section 5 of the mortgage agreement,[9] (2) the plaintiff sent the defendant four separate notices of its intent to force place insurance coverage on the property pursuant to the mortgage agreement, and, in each of those notices, it represented that the amounts charged to the defendant covered the " '*cost* of the insurance policy' " and failed to disclose that the defendant would be charged more

---

[9] Section 5 of the mortgage agreement provides in relevant part: "[The] [b]orrower shall keep the improvements existing or hereafter erected on the [p]roperty insured against loss by fire, hazards included within the term 'extended coverage,' and any other hazards including, but not limited to, earthquakes and floods, for which [the] [l]ender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that [the] [l]ender requires. What [the] [l]ender requires pursuant to the preceding sentences can change during the term of the [l]oan. The insurance carrier providing the insurance shall be chosen by [the] [b]orrower subject to [the] [l]ender's right to disapprove [the] [b]orrower's choice, which right shall not be exercised unreasonably. . . . If [the] [b]orrower fails to maintain any of the coverages described above, [the] [l]ender may obtain insurance coverage, at [the] [l]ender's option and [the] [b]orrower's expense. [The] [l]ender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover [the] [l]ender, but might or might not protect [the] [b]orrower, [the] [b]orrower's equity in the [p]roperty, or the contents of the [p]roperty, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. [The] [b]orrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that [the] [b]orrower could have obtained. Any amounts disbursed by [the] [l]ender under this [s]ection . . . shall become additional debt of [the] [b]orrower secured by this [s]ecurity [i]nstrument. These amounts shall bear interest at the [n]ote rate from the date of disbursement and shall be payable, with such interest, upon notice from [the] [l]ender to [the] [b]orrower requesting payment. . . ."

than the cost, (3) the plaintiff failed to disclose that it had an exclusive relationship with ASIC or that it had a financial arrangement with ASIC in exchange for that exclusive relationship, (4) the plaintiff did not pass on to the defendant the rebates it received from ASIC and charged the defendant more than the plaintiff's costs for force placing coverage on the defendant's property, (5) the plaintiff's representations to the defendant were false and were made to induce the defendant to act to his detriment, and (6) the defendant acted on these allegedly false representations to his detriment. (Emphasis added.) Finally, the defendant alleges in his answer that the plaintiff's false representations undermined the validity of the mortgage. Contrary to the trial court's conclusion, therefore, the defendant's answer included allegations of wrongdoing regarding his specific mortgage.

The question remains whether those allegations are sufficiently related to the making, validity or enforcement of the mortgage. We conclude that they are. Put simply, the defendant's answer alleges that, in force placing insurance coverage on the property, the plaintiff relied on section 5 of the mortgage agreement, which authorized it to purchase force placed insurance coverage in the event of the borrower's failure to maintain the proper insurance. See footnote 9 of this opinion. By purchasing force placed insurance through ASIC, therefore, the plaintiff was enforcing its rights under the mortgage agreement. In doing so, the defendant alleges, the plaintiff charged the defendant an amount greater than the "cost" of the insurance, in violation of section 5 of the mortgage agreement, concealed a "kickback" agreement that it had with ASIC by which the plaintiff received what the defendant characterizes as "rebates" in exchange for using ASIC exclusively for its force placed insurance coverage, failed to pass on those rebates to the defendant, and made misrepresen-

tations to the defendant that he would be charged solely for the cost of the force placed insurance coverage. All of this alleged conduct is directly related to the plaintiff's reliance on and enforcement of section 5 of the mortgage agreement.

The timing of the plaintiff's reliance on the mortgage agreement to purchase force placed insurance coverage, which occurred after the execution of the mortgage documents, does not bring the defendant's special defenses outside of the scope of the making, validity or enforcement test. In *U.S. Bank National Assn.* v. *Blowers*, supra, 332 Conn. 665–75, we, for the first time, examined the contours of the making, validity, or enforcement test. Although we recognized that the test is "a legal creation of uncertain origin," we declined to abandon it. Id., 665; see id., 665–67. We instead defined the term "enforcement" to have a broad temporal scope, which encompasses a mortgagee's conduct during postdefault loan modification negotiations if the alleged misconduct substantially increases the overall debt or impedes a mortgagor from curing the default. See id., 667, 675.

Our rationale in *Blowers* for broadening the temporal scope of "enforcement" is relevant in the present appeal. We began with the principle that the making, validity, or enforcement test does not require mortgagors "to meet a more stringent test than that required for special defenses and counterclaims in nonforeclosure actions. We therefore interpret the test as nothing more than a practical application of the standard rules of practice that apply to all civil actions to the specific context of foreclosure actions." Id., 667. With that in mind, we rejected the notion that enforcement of a note or mortgage is limited in temporal scope to exclude conduct that occurred "after the origination of the loan, after default, and even after the initiation of the foreclosure action . . . ." Id., 672. We noted that, in addition to the validity of the note and mortgage, "[t]he mortgagor's

rights and liabilities" also depend "on the amount of the debt." Id., 674. We concluded, therefore, that "allegations that the mortgagee has engaged in conduct that wrongfully and substantially increased the mortgagor's overall indebtedness, caused the mortgagor to incur costs that impeded the mortgagor from curing the default, or reneged [on] modifications are the types of misconduct that are directly and inseparably connected . . . to enforcement of the note and mortgage." (Citation omitted; internal quotation marks omitted.) Id., 675.

The alleged effect of the plaintiff's conduct in enforcing section 5 of the mortgage agreement—that it wrongfully increased the defendant's overall debt—provides a sufficient nexus to the foreclosure action. The plaintiff's contractual right to purchase force placed insurance coverage allows the plaintiff to secure its interests by ensuring that the property is insured against damage when a homeowner has allowed coverage to lapse. The connection between that contractual right and the foreclosure action itself is neither necessary nor immediately obvious. Nevertheless, our rationale in *Blowers* clarifies the connection of that right to this foreclosure action in light of the defendant's allegations. Specifically, the defendant alleges that the plaintiff, by engaging in its undisclosed kickback scheme with ASIC, charged the defendant *more than the cost* of its purchase of force placed insurance coverage. Construing the defendant's allegations in the manner most favorable to sustaining their legal sufficiency, we conclude that the defendant has sufficiently alleged that the plaintiff's misconduct increased his overall debt beyond that which was necessary to protect the plaintiff's interest in the property.[10] Therefore, we conclude that the defen-

---

[10] We recognize that the defendant's allegations do not claim specifically that the plaintiff's misconduct "substantially" increased his overall indebtedness, or offer any precise statement of the additional charges he incurred above and beyond the plaintiff's actual costs. See *U.S. Bank National Association* v. *Blowers*, supra, 332 Conn. 672. That information—the difference between what the plaintiff's actual costs were and what the plaintiff charged

dant's allegations in support of the special defenses are sufficiently connected to the enforcement of the mortgage.

The answer also alleges a connection to the validity of the mortgage. The defendant alleges that the plaintiff's "fraudulent representations directly [undermine] the validity of the mortgage documents." A reasonable inference from this allegation, read together with the defendant's broader allegations in the answer claiming that the plaintiff's kickback scheme was ongoing and on a broad scale, is that the defendant contends that, because the plaintiff entered into the mortgage agreement with the alleged scheme in place, along with its accompanying misrepresentations, the mortgage agreement is invalid. Without offering any opinion on the ultimate merits of this theory, we conclude that the defendant has alleged that the plaintiff's conduct relates to the validity of the mortgage.

In addition to alleging a sufficient connection to the mortgage or note, each special defense must otherwise be legally sufficient. The plaintiff claims that, because the defendant breached the underlying loan contract—that is, because the defendant defaulted—he is barred from relying on the doctrine of unclean hands. We disagree.

"[A]n action to foreclose a mortgage is an equitable proceeding. . . . It is a fundamental principle of equity jurisprudence that for a [plaintiff] to show that he is

the defendant, and the ratio of that amount to the total amount of indebtedness, and the resulting "substantiality" of the increase in debt—would be in the hands of the plaintiff and would be subject to discovery. Accordingly, we decline to conclude that the defendant's special defenses lack a sufficient nexus to the mortgage on the basis of the omission of the word "substantially." See, e.g., *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 536, 51 A.3d 367 (2012) ("[t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically" (internal quotation marks omitted)).

entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied not by way of punishment but on [the basis of] considerations that make for the advancement of right and justice. . . . The doctrine of unclean hands expresses the principle that [when] a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." (Citations omitted; internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001). "The doctrine generally applies [only] to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the [plaintiff] in other matters or questioning his general character for fair dealing. The wrong must . . . be in regard to the matter in litigation. . . . [Although] an obligation [may] be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement, if the plaintiff does not require the aid of the illegal transaction to make out his case." (Internal quotation marks omitted.) Id., 310–11.

A mortgagor who has defaulted on a mortgage is not precluded from asserting the special defense of unclean hands. See, e.g., *U.S. Bank National Assn.* v. *Blowers*, supra, 332 Conn. 658, 678 (reversing judgment granting motion to strike special defense of unclean hands with respect to mortgagor's alleged misconduct during post-default modification negotiations); *U.S. Bank National Assn.* v. *Eichten*, 184 Conn. App. 727, 746–50, 196 A.3d 328 (2018) (question of material fact existed as to whether mortgagee had unclean hands when claimed miscon-

duct occurred postdefault). Accordingly, we reject the plaintiff's claim that the defendant in the present case is barred from relying on the doctrine of unclean hands and proceed to consider whether he sufficiently alleged the doctrine as a special defense.

In support of his defense of unclean hands, the defendant alleges that the plaintiff misrepresented that he would be charged solely for the cost of purchasing force placed insurance coverage as part of the plaintiff's alleged kickback scheme, in which it retained rebates that should have been passed on to the defendant. Taking these allegations as true, we conclude that the defendant has alleged wilful conduct that is not equitable, fair or honest. Additionally, as we already explained, the defendant's allegations are directly connected to the plaintiff's enforcement of the mortgage. This type of misconduct falls squarely within the doctrine of unclean hands. See, e.g., *Thompson* v. *Orcutt*, supra, 257 Conn. 310–14 (defendant in foreclosure action could rely on doctrine of unclean hands, when plaintiff had made intentional misrepresentations in bankruptcy proceedings that prompted bankruptcy court to abandon subject mortgage as asset of bankruptcy estate, thus permitting foreclosure action to proceed).

As to the special defense of breach of the implied covenant of good faith and fair dealing, the plaintiff contends that this defense is legally insufficient because the defendant failed to plead any causal connection between the plaintiff's alleged bad acts and his default under the terms of the note and mortgage. Because we have concluded that the defendant's answer alleges that the plaintiff's misconduct increased his overall indebtedness, we conclude that he has properly alleged the special defense of breach of the implied covenant of good faith and fair dealing.

"[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a

contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed [on] by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007).

In order to properly allege a special defense predicated on breach of the implied covenant of good faith and fair dealing, the defendant had to plead that the plaintiff's alleged misrepresentations interfered with his right to receive the benefits of the agreement. This he has done by alleging that the plaintiff's kickback scheme wrongfully resulted in the defendant's payment of more than he was obligated to pay and more than the plaintiff was entitled to charge him, pursuant to the mortgage agreement. Although he did not plead that the plaintiff's misconduct caused him to default, he did allege, as we have explained, that it increased his overall debt. Accordingly, we conclude that the trial court improperly struck the special defenses.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.